## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHELLEY NIEMI, derivatively on behalf of TRUECAR, INC., | Case No: |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | <u>DEMAND FOR JURY TRIAL</u> |
| VICTOR PERRY, MICHAEL GUTHRIE, JOHN PIERANTONI, ABHISHEK AGRAWAL, ROBERT BUCE, CHRISTOPHER CLAUS, STEVEN DIETZ, JOHN KRAFCIK, ERIN LANTZ, JOHN MENDEL, WESLEY NICHOLS, ION YADIGAROGLU, and THE UNITED STATES AUTOMOBILE ASSOCIATION | |
| Defendants | |
| -and- | |
| TRUECAR, INC., a Delaware corporation, | |
| Nominal Defendant. | |

By and through her undersigned counsel, Plaintiff Shelley Niemi ("Plaintiff"), brings this stockholder derivative action on behalf of Nominal Defendant TrueCar, Inc. ("TrueCar" or the "Company") against certain current and/or former officers and directors of the Company for breaches of fiduciary duties, insider selling and misappropriation of information, unjust enrichment, and corporate waste, and other violations of law, from at least February 16, 2017 through the present (the "Relevant Period").  In addition, Plaintiff, derivatively on behalf of the Company, seeks contribution or indemnity from the Individual Defendants for their acts of corporate misconduct, which have exposed the Company to civil liability under the federal securities laws.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by TrueCar and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, stockholder communications, and postings on TrueCar's website concerning the Company's public statements; (d) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *Milbeck v. TrueCar, Inc., et al.*, Case No. 2:18-cv-02612-SVW-AGR (C.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning TrueCar and the Individual Defendants (defined below).

## I.    NATURE AND SUMMARY OF THE ACTION

1.    TrueCar operates an internet-based platform, including a company-branded website and mobile applications, through which it provides automobile pricing and other information for new and used car buyers and dealers.  According to its marketing materials, TrueCar purports to

give consumers the "TruePrice – the Actual Price You Will Pay at the Dealership." Potential car buyers can use TrueCar to search for the make and model of the car they want, obtain market pricing data, and then use the website to connect with TrueCar's network of Certified Dealers, so they can purchase their desired car for a guaranteed price below the car's manufacturer's suggested retail price.

2.      TrueCar generates its revenue through fees paid by Certified Dealers for each car (*i.e.*, "unit") sold through the Company's website. Certified Dealers either pay TrueCar a fee per each vehicle sold through TrueCar ($299 for new cars and $399 for used cars) or can pay a subscription fee based on the actual number of cars sold through TrueCar.

3.      Because TrueCar's revenue depends on the number of cars sold through its website, the Company's business model depends on its continuing ability to draw and attract consumers to its website. According to the Company's SEC filings, most of the cars purchased through TrueCar's website are from car buyers who were directed to the site by TrueCar's "affinity group marketing partners." Most of TrueCar's affinity partners are financial institutions and member organizations that direct consumers to the TrueCar's website in exchange for marketing fees. Since TrueCar's affinity partnerships drive the majority of the car sales on its site, the Company has stated in its SEC filings that such partnerships are "critical" to its unit sales growth and financial performance.

4.      The United States Automobile Association ("USAA") historically has been TrueCar's largest and most important affinity partner, as that partnership has generated nearly one-third of the Company's annual unit sales and revenues prior to and during the Relevant Period. The partnership with USAA was so crucial to TrueCar's business that the Company specifically

disclosed as a "risk factor" in its SEC filings that "USAA has a significant influence on our operating results."

5.      As part of its close partnership with USAA, TrueCar maintained and operated a "co-branded" car buying site with USAA.  As stated in TrueCar's SEC filings, USAA had "broad discretion" over how the co-branded car buying site it shared with TrueCar was operated, marketed, and promoted.  Because of USAA's critical importance to TrueCar's financial success, the Company reported that if USAA were to use its "broad discretion" to make changes to the car buying site, TrueCar's "revenue, business and financial results will be harmed."

6.      In addition to being TrueCar's most significant affinity partner, USAA was also TrueCar's largest stockholder.  Notably, TrueCar's Chairman of the Board during the Relevant Period was Christopher Claus ("Claus"), a former senior executive of USAA and board member of a USAA affiliate.

7.      By the beginning of 2017, the very risks that TrueCar had warned of concerning USAA and its broad discretion over the co-branded car buying site actually materialized, and, almost immediately thereafter, had an adverse impact on TrueCar's business.  Specifically, in or around January 2017, USAA made the decision to redesign the co-branded car buying site it shared with TrueCar, which included adding questions to the site requiring USAA members to provide information about their personal finances and monthly budgets.  The purpose of these questions was to make sure USAA members could actually afford to purchase the cars before they could access the car buying site.  USAA's redesign, which was formally implemented by June of 2017, would have a material, negative impact on the number of consumers who were directed to TrueCar's web platform, ultimately hurting TrueCar's bottom line.  Indeed, as would later be

admitted by Defendants, USAA's "significant website redesign" would have a substantial adverse impact to TrueCar's unit and revenue growth.

8.     During the Relevant Period, the Individual Defendants misleadingly assured investors that USAA's ability to change the co-branding car buying website it shared with TrueCar was merely a "risk," when, in fact, USAA had already decided to implement such changes by early 2017.  Specifically, the Individual Defendants made or caused TrueCar to make false and/or misleading statements and/or failed to disclose that: (i) USAA, the Company's most important affinity partner, would be making significant changes to the co-branded car buying site it shared with TrueCar; (ii) these changes would have a material adverse effect on the volume of car sales on the site that were generated by USAA; and (iii) as a result, TrueCar's unit sales, revenues, and financial growth would be adversely affected.  Due to the close and intertwined nature of the partnership between TrueCar and USAA, the Individual Defendants were well aware of USAA's decision to implement significant website changes in early 2017 and that it would do so by June 2017, and that such changes would cause the Company's website traffic, sales, and revenues to materially decline.

9.     The Individual Defendants' false and misleading statements (and other wrongdoing, such as the failure to implement, maintain, or follow adequate internal controls) caused TrueCar stock to trade at artificially-inflated levels during the Relevant Period.  As a result of the Individual Defendants' wrongdoing and deception, the share price of TrueCar's stock dramatically increased by 60% (from approximately $13 per share to over $21 per share) during the Relevant Period.

10.     Once it was revealed that USAA had actually made significant changes to the co-branded car buying site and that the risks that TrueCar had previously warned of had actually

materialized, TrueCar's stock was hammered by massive sales, driving down the share price from its artificially inflated highs, erasing hundreds of millions of dollars of the Company's market capitalization.

11.     Indeed, by June 2017, TrueCar had implemented USAA's changes to the site, which resulted in a significant decline in traffic, units and revenues from USAA members, and for TrueCar overall.  However, the investing public would not become aware of the impact of these changes until November 2017, when TrueCar issued a dismal earnings report for the third quarter of 2017.  By that point, TrueCar was forced to reveal that its sales units attributable to USAA had significantly declined and that the Company had failed to meet its previously-issued earning guidance.  Moreover, to the shock of the investment community, Defendant Victor "Chip" Perry ("Perry"), TrueCar's President, Chief Executive Officer ("CEO"), and member of the Company's Board of Directors (the "Board"), admitted that the decline in USAA car sales was directly attributable to changes that USAA had previously made to the cobranded car buying site months ago.  Perry specifically acknowledged that the changes made by USAA were so extensive that they amounted to a "significant website redesign," causing "a decline in traffic, prospects, and units on USAA."

12.     Unfortunately, the Individual Defendants' corporate malfeasance did not end there. While the Company's stock price was artificially inflated, certain of the officers and directors of TrueCar exploited their positions as corporate fiduciaries of the Company and, with knowledge of material, adverse, and non-public information regarding the Company's operations and business prospects, sold their personal stock holdings for tens of millions of dollars in insider profits.

13.     Notably, a large portion of these illegal insider sales coincided with a secondary offering conducted by TrueCar.  On April 26, 2017, TrueCar closed on the secondary offering,

whereby it sold 1,150,000 shares of TrueCar common stock at $16.50 per share, realizing approximately $19 million, or just over 10% of the total proceeds from the offering.  However, USAA and the selling stockholders—which included several entities affiliated with members of TrueCar's Board—realized approximately 90% of the proceeds from the offering, or $151.8 million.  Indeed, USAA—which knew that it would have TrueCar implement changes to the co-branded TrueCar car buying website that would significantly reduce TrueCar's traffic, units and revenue—sold 26% of its TrueCar holdings, realizing $51.7 million in proceeds, or 34% of the total proceeds from the offering.  At the time of the secondary offering, none of the Individual Defendants sold their TrueCar stock, but this was only because they were subject to a 90-day Lock-Up Period that was scheduled to expire on July 25, 2017.

14.     On July 26, 2017 – just one day after the expiration after the Lock-Up Period and a week after TrueCar's stock price had reached its peak price of $21.75 per share – Defendants Michael Guthrie ("Guthrie") and John Pierantoni ("Pierantoni") and other Company insiders began to sell of their shares of TrueCar stock.  Within a week of the Lock-Up Period's expiration, these insiders collectively sold nearly 1 million TrueCar shares, realizing approximately $19 million in gross proceeds.  Defendant Guthrie, TrueCar's Chief Financial Officer ("CFO"), was the largest inside seller, as he sold over 737,000 TrueCar shares—or 54% of his total holdings—realizing nearly $14 million in ill-gotten gains.  Glaringly, Guthrie had not sold a single share of TrueCar stock in the twelve-month period preceding the Relevant Period.  Moreover, Defendant Pierantoni, TrueCar's Chief Accounting Officer, sold close to 50% of his total holdings during this time, realizing $1.2 million in ill-gotten proceeds.  In sum, Company insiders sold over 1.2 million TrueCar shares during the Relevant Period and received in excess of $22 million in gross proceeds.

15.     The Company has been, and will continue to be, damaged by the unlawful conduct alleged herein.  Indeed, as a result of the Individual Defendants' corporate misconduct, which caused the improper reporting and dissemination of false and misleading information, an aggrieved stockholder filed the Securities Class Action on March 30, 2018.  On February 5, 2019, the Honorable Stephen V. Wilson, United States District Court Judge of the Central District of California, issued an order in the Securities Class Action, denying defendants' motion to dismiss in its entirety and holding that plaintiffs in that case had satisfied the heightened pleading standards of Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"). Accordingly, TrueCar and certain of its officers and directors continue to be exposed to substantial liability for their violations of the federal securities law.

16.     The Board of TrueCar has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board are directly interested in the personal financial benefits challenged herein, that were not shared with TrueCar stockholders, and/or face a substantial likelihood of liability to TrueCar for breaching their fiduciary duties of loyalty and good faith by authorizing or failing to correct the false and misleading statements alleged herein, and/or lack independence.  Accordingly, a pre-suit demand upon the Board was, and is, a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to TrueCar.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this action states a federal question.  Plaintiff has asserted a federal claim of contribution derivatively on behalf of the Company, arising under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78u-4.  Pursuant to federal statutory law, this Court has original federal question jurisdiction over the federal contribution claim.

18.     This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because (i) TrueCar maintains its principal executive offices in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

22.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.   PARTIES

23.     Plaintiff is a current stockholder of TrueCar and has continuously held TrueCar common stock since November 2014.

24.     Nominal Defendant TrueCar is a Delaware corporation with its corporate headquarters at 120 Broadway, Suite 200, Santa Monica, California 90401.

25.     Defendant Perry has served as the Company's President, CEO, and a director since December 2015. As TrueCar's CEO, Perry is a member of the Company's Disclosure Committee. Perry is also named as a defendant in the Securities Class Action.

26.     Defendant Guthrie served as the Company's CFO from January 2012 until his resignation for "personal reasons" on January 28, 2018. As TrueCar's CFO, Guthrie was a member of the Company's Disclosure Committee. During the Relevant Period, Guthrie sold at least 737,916 shares of TrueCar stock for proceeds of $13,962,608. Guthrie is also named as a defendant in the Securities Class Action.

27.     Defendant Pierantoni served as the Company's Chief Accounting Officer from 2013 until February 1, 2018, when he became the Company's interim CFO, an executive position he continues to hold as of the date of the filing of this action. As TrueCar's Chief Accounting Officer, Pierantoni was Co-Chair of the Company's Disclosure Committee. During the Relevant Period, Pierantoni sold at least 62,522 shares of TrueCar stock for proceeds of $1,214,940. Pierantoni is also named as a defendant in the Securities Class Action.

28.     Defendant Abhishek Agrawal ("Agrawal") served as director of the Company from November 2013 until May 2017, when he declined to stand for re-election to the Company's Board. As part of the Secondary Offering, entities associated with Agrawal sold more than 1.3 million shares of TrueCar stock for proceeds of $21,535,173. During the Relevant Period, Agrawal was a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Agrawal is also named as a defendant in the Securities Class Action.

29.     Defendant Robert Buce ("Buce") has served as a director of the Company since April 2005.  Buce also served as Executive Vice President and CFO of TrueCar from September 2005 to September 2008.  During the Relevant Period, Buce served as the Chair of the Audit Committee.  Buce is also named as a defendant in the Securities Class Action.     During the Relevant Period, Buce sold at least 32,999 shares of TrueCar stock for proceeds of $544,998.

30.     Defendant Claus has served as the Company's Chairman of the Board since February 2016 and has been a director of the Company since April 2014.  During the Relevant Period, Claus has been a member of the Audit Committee and the Compensation Committee.  From December 1994 to March 2014, Claus held senior executive positions at USAA, including President of USAA Financial Services Group.  Since 2009 and continuing to the present, Claus has been a board member of USAA Real Estate Company.  Claus is named as a defendant in the Securities Class Action.

31.     Defendant Steven Dietz ("Dietz") served as a director of the Company from February 2006 until his resignation in October 2018.  In the Secondary Offering, entities affiliated with Dietz sold at least 1.32 million shares of TrueCar stock for proceeds of $21,791,418.  During the Relevant Period, Dietz served as the Chairman of the Compensation Committee.  Dietz is also named as a defendant in the Securities Class Action.

32.     Defendant John Krafcik ("Krafcik") has served as a director of the Company since February 2014.  Krafcik also served as President of TrueCar from April 2014 to September 2015.  During the Relevant Period, Krafcik sold at least 20,000 shares of TrueCar stock for proceeds of $334,500.  Krafcik is also named as a defendant in the Securities Class Action.

33.     Defendant Erin Lantz ("Lantz") has served as a director of the Company since November 2016.  During the Relevant Period, Lantz has served as a member of the Audit

Committee and the Nominating and Corporate Governance Committee.  Lantz is also named as a defendant in the Securities Class Action.

34.     Defendant John Mendel ("Mendel") has been a director of the Company since May 2017.  During the Relevant Period, Mendel has been the Chairman of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

35.     Defendant Wesley Nichols ("Nichols") has been a director of the Company since November 2016.  During the Relevant Period, Nichols has been the Chairman of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Nichols is named as a defendant in the Securities Class Action.

36.     Defendant Ion Yadigaroglu ("Yadigaroglu") has been a director of the Company since August 2007.  In the Secondary Offering, entities affiliated with Yadigaroglu sold at least 509,459 shares of TrueCar stock for proceeds of $8,406,074.   During the Relevant Period, Yadigaroglu has been a member of the Nominating and Corporate Governance Committee, and was formerly the chairman of that committee. Yadigaroglu is named as a defendant in the Securities Class Action.

37.     Defendant USAA is an unincorporated association, with offices at 9800 Fredericksburg Road, San Antonio, Texas 78288.  USAA and its various affiliates and subsidiaries provides banking, investing and insurance services to its members, who include people and families who serve, or served, in the military. As of February 28, 2017, USAA and affiliates beneficially owned 12,175,335 shares of TrueCar stock, making USAA the Company's largest stockholder, holding approximately 13.9% of the Company's shares.  In the Secondary Offering, USAA sold over 3.1 million shares, for proceeds of approximately $51.7 million.

38.     Defendants identified in ¶¶ 25–37 are sometimes collectively referred to herein as the "Individual Defendants."

39.     Defendants Perry, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu are sometimes collectively referred to herein as the "Director Defendants."

40.     Defendants Perry, Guthrie, Pierantoni, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Nichols, and Yadigaroglu are each named as defendants in the Securities Class Action and are sometimes collectively referred to herein as the "Securities Class Action Defendants."

41.     Defendants Buce, Claus, and Lantz are sometimes collectively referred to herein as the "Audit Committee Defendants."

42.     Defendants Guthrie, Pierantoni, Agrawal, Buce, Dietz, Krafcik, and Yadigaroglu are sometimes collectively referred to herein as the "Insider Selling Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     TrueCar's Corporate Background and Business Model

43.     According to its filings with the SEC, TrueCar is a digital automotive marketplace that provides comprehensive transparency about the purchase price of automobiles, which enables consumers to engage with car dealers for a "superior purchase experience."

44.     TrueCar allows consumers to research pricing for the make and model of car that they are looking for, either through the TrueCar.com website, its mobile apps, or through co-branded websites with the Company's affinity group marketing partners.  Consumers are then directed to a network of TrueCar Certified Dealers to purchase their vehicle.  Each Certified Dealer pays fees to TrueCar for each car, or "unit," sold through the site ($299 for new cars and $399 for used cars) or can pay a subscription fee based on the actual number of cars sold through TrueCar. TrueCar's business model therefore depends on its ongoing ability to draw and attract consumers to its website.

45.     The Company was originally incorporated in Delaware in 2005 under the name Zag.com Inc., by several co-founders including Scott Painter, who served as the Company's first CEO.  In 2011, TrueCar raised $200 million in debt and equity financing, and purchased ALG, a company that analyzes the future residual value of cars, for $83 million.  Later that year, the Company faced backlash from the automotive industry after several state regulatory agencies notified TrueCar that its practices were non-compliant with state laws.  In response, TrueCar redesigned its pricing structure, and in some states moved from a pay-per-sale model to a subscription model for auto dealers.

46.     Scott Painter stepped down as CEO and was replaced by Defendant Perry in December 2015.  As of the filing of this action, Perry continues to serve as the Company's CEO, President, and a director.

47.     In a press release dated June 10, 2014, the Company reported that over 1 million new and used vehicles had been purchased through its Affinity Auto Buying Programs ("ABP").  The Company stated that it had over 576 brands as affinity partners, including Fortune 500 companies, eCommerce sites, banks, credit unions, and insurance companies.  The press release stated:

> "We are honored and privileged to partner with respected brands such as USAA, AAA, American Express, U.S. News & World Report, Farmers and GEICO," said TrueCar founder and CEO Scott Painter.  "Achieving 1 million vehicle sales is a significant milestone because it means the ABP has provided over $3 billion in savings from TrueCar Certified Dealers to consumers and employees of these companies.  Our ability to leverage the marketing resource, reach and strength of our partners' brands through the ABP gives us unrivaled access to most U.S. automotive consumers looking to purchase, finance and trade-in their cars."

> "We're delighted to offer to our 8,000-plus TrueCar certified dealers, and the automotive brands they represent, the opportunity to connect with most American households through trusted affinity program relationships," said TrueCar President John Krafcik. "Affinity members value that trust, and the price confidence our negotiation-free car-buying platform can provide, while our

retail partners benefit from a fully accountable, pay-for-performance marketing model. It's a winning approach for all."

48.     As of October 2015, TrueCar had more than 10,000 dealerships in its TrueCar Certified Dealer network.

49.     TrueCar's affinity partnerships are critical to the Company's ongoing financial health, as such partnerships drive the majority of the car sales on its site.   According to the Company's SEC filings:

> Our financial performance is substantially dependent upon the number of automobiles purchased from TrueCar Certified Dealers by users of the TrueCar website . . . .  Currently, a majority of the automobiles purchased by our users were matched to the car-buying sites we maintain for our affinity group marketing partners.  As a result, our relationships with our affinity group marketing partners are critical to our business and financial performance.

50.     Before and continuing throughout the Relevant Period, the TrueCar's largest and most significant affinity partner was USAA, as it generated nearly one-third of TrueCar's annual unit sales and revenues in 2016.  In addition, USAA was TrueCar's largest stockholder, holding approximately 14% of TrueCar's stock.

51.     As reported in TrueCar's SEC filings: "The largest source of user traffic and unit sales from our affinity group marketing partners comes from the site we maintain for USAA."  The Company also reported in its 2016 Form 10-K that USAA generated 32% of TrueCar's annual revenues that year, meaning that 32% "of all units purchased by users from TrueCar Certified Dealers . . . were matched to users of the car-buying site [TrueCar] maintain[s] for USAA."  The 2016 Form 10-K further stated that, "USAA has a significant influence on our operating results."

52.     As part of its close partnership with USAA, TrueCar maintained and operated a co-branded car buying site with USAA.  As stated in TrueCar's SEC filings, USAA had "broad discretion" over how that site was operated, marketed, and promoted.  Accordingly, due to USAA's critical importance to TrueCar's financial success, TrueCar reported that if USAA were

15

to use its "broad discretion" to make changes to the car buying site, TrueCar's "revenue, business and financial results will be harmed."

53.    While TrueCar's SEC filings stated that USAA had "broad discretion in how the car buying site . . . [was] promoted and marketed on its own website," it was TrueCar that bore the responsibility for "maintain[ing]" the co-branded site — which meant that TrueCar hosted, managed and operated the car buying site for USAA.  Accordingly, any changes USAA made to the car buying site would necessarily require TrueCar's involvement in order to implement them. Indeed, due to the close-knit and intertwined relationship between TrueCar and USAA, TrueCar's most senior executives—including Defendants Perry, Guthrie, and Pierantoni—had direct involvement in the management and oversight of the co-branded car buying site.  For example, Defendant Perry acknowledged during the Company's third quarter 2016 earnings call just prior to the Relevant Period that he personally worked with "USAA's most senior executives and the team assigned to the day-to-day management of their car buying service."

54.    The Services & Maintenance Agreement governing TrueCar's management of the car buying website for USAA, publicly filed with the SEC in 2014 (the "Services Agreement"), further highlights the close, intertwined relationship between the two companies.  For instance, the Services Agreement required TrueCar to provide USAA with a "full-time program manager" who would be dedicated to overseeing maintenance of the car buying site.  USAA also gave specific directions concerning the conduct and quality of TrueCar employees who would be interacting with USAA members in connection with the car buying site, requiring TrueCar to (i) conduct regular drug tests on "each employee that will provide [s]ervices on USAA's premises unescorted by USAA"; (ii) direct TrueCar employees working on the site to comply with USAA's policies while on USAA's premises (including dress code and various detailed security policies);

(iii) require TrueCar employees to attend orientation programs conducted by USAA on USAA's premises before performing any services on the car buying site; and (iv) conduct "thorough background check[s] on any [TrueCar] [e]mployees who will have access to [USAA member] [d]ata" prior to the employee performing any services on the site.  Also, any subcontractors used by TrueCar who would have access to USAA member data, or USAA computing systems had to be "pre-approved by USAA."

55.     The Services Agreement further provided that TrueCar would maintain a call center at its Austin, Texas offices to respond to questions from USAA members about the car buying site. Under the Services Agreement, USAA had full control over how the Austin call center would be operated.  For example, the Service Agreement stated that TrueCar would (i) utilize specific call scripts, subject to approval and changes by USAA, to use for calls with USAA members; (ii) submit a written "Calling Plan" to be approved by USAA detailing the allowed days and timeframes for calling USAA members; (iii) answer 80% of USAA members' calls within 30 seconds with a live voice; (iv) provide monthly "scorecards" to USAA showing, among other things, how fast calls were answered; (v) track, log, and escalate all USAA member complaints to USAA on a monthly basis; and (vi) maintain a quality monitoring program for calls with USAA members.  Additionally, TrueCar was required to provide USAA physical access to TrueCar's call center facilities "on both a scheduled and non-scheduled basis to monitor performance."  TrueCar was also required to allow USAA to "audit training sessions" for TrueCar employees and allow USAA to provide "culture training" to TrueCar employees who interacted with USAA members.

56.     Due to USAA's substantial contribution to TrueCar's unit sales and revenue stream, TrueCar reported in its SEC filings prior to the Relevant Period that "[c]hanges in [USAA's] promotion and marketing [of the car-buying site] have in the past and may in the future adversely

affect the volume of user traffic we receive from USAA," which "could adversely affect our business and operating results in the future." The Company's SEC filings further indicated that if USAA exercised its broad discretion to change the car buying website in a way that "de-emphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed. TrueCar went as far as to state that even minor changes made by USAA to the car buying website, such as a prior adjustment to "the location and prominence of the links to [TrueCar's] platform on [USAA's] web pages," could cause financial harm to the Company:

> [C]hanges in how USAA promotes and markets the car-buying site we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by USAA members. For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform. Should USAA or one or more of our other affinity group marketing partners decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed.

57.     While TrueCar had numerous affinity partners, the Company only made specific warnings in its SEC filings (included within the "Risk Factor" section of the filings) about USAA. These specific warnings highlight the critical importance of USAA to TrueCar's ongoing financial health and signaled that the Company's bottom line would be materially and negatively impacted if and when USAA made any adverse changes to the co-branded car buying website.

**B.     During the Relevant Period, USAA Implemented Material Changes to the Co-Branded Car Buying Website That Adversely Impacted TrueCar's Business**

58.     By the beginning of 2017, the very risks that TrueCar had warned of concerning USAA and the possibility that it could make changes to the co-branded car buying site actually materialized – which, soon thereafter, wreaked havoc on TrueCar's business operations and financial health. Specifically, in or around January 2017, USAA made the decision to redesign the co-branded car buying site, which included, among other things, adding questions to the site requiring USAA members to provide information about their personal finances and monthly

budgets.  The purpose of these questions was to make sure USAA members could actually afford to purchase the cars before they could access the car buying site.  USAA's significant redesign, which would be formally implemented in June 2017, caused a significant to decrease in the number of consumers who were directed to TrueCar's web platform, thus hurting TrueCar's bottom line. In fact, as would later be admitted by Defendants, USAA's "significant website redesign" would have a deleterious impact on TrueCar's unit sales and revenue growth.

59.    TrueCar's senior management and Board and were well aware of USAA's decision to make significant modifications to the co-branded car buying site by early 2017 and the implementation of those changes by June 2017.  As detailed herein, USAA was critically important to TrueCar's business and thus, any material change to the co-branded car buying website would have been well known to the decisionmakers within the Company.  As TrueCar acknowledged in its SEC filings, USAA was "[t]he largest source of user traffic and unit sales from our affinity group marketing partners," accounting for 32% of all units in 2016.  TrueCar's SEC filings stated that, as a result, "USAA has a significant influence on our operating results."

60.    Indeed, it was well known within the Company that the type of modifications that USAA wanted to make to the website would negatively affect the number of USAA members who visited the site and adversely impact the Company's unit sales, revenues and financial growth.  As reflected in the Company's SEC filings, the Individual Defendants knew that even minor changes to the USAA car buying site would significantly impact the Company's financial results.  TrueCar explicitly stated in its SEC filings that "[s]hould USAA . . . decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed."  Those filings also provided a specific example of a relatively minor change to the car buying site by USAA that previously had a significant impact on the

Company's financial results, stating: "For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform." Accordingly, there was no question that the Individual Defendants knew those changes would profoundly and adversely affect the Company's financial results.

61. The Individual Defendants were also keenly aware of USAA's decision to implement the significant redesign of the co-branded car buying site in early 2017, due the close partnership between TrueCar and USAA. TrueCar was responsible for hosting, managing, and operating the car buying website for USAA. As the Company's own SEC filings disclosed, as part of its affinity partnership with USAA, TrueCar was in charge of "maintaining" the car buying website for USAA, meaning that, as outlined in the Services Agreement between TrueCar and USAA, TrueCar was in charge of hosting, managing, and operating the site. This meant that TrueCar would have been directly involved in any alterations affecting the car buying site and would have been informed of such changes well in advance of their implementation.

62. Aside from directly managing the car buying website for USAA, TrueCar's relationship was inextricably intertwined with USAA, insofar as USAA was TrueCar's largest single stockholder – owning approximately 14% of TrueCar's stock during the Relevant Period. Also, USAA historically had representation on TrueCar's Board, with Defendant Claus becoming the USAA representative on TrueCar's Board in April 2014. Two years later, Claus was elected as Chairman of TrueCar's Board, a position that he held throughout the Relevant Period.

63. Moreover, as highlighted in the Services & Maintenance Agreement between TrueCar and USAA, USAA largely "dictated" TrueCar's business, providing detailed directions on how TrueCar was to manage the car buying site. Specifically, USAA mandated that TrueCar drug test and conduct thorough background checks of its employees who had access to USAA

member data or who interacted with USAA members, allow USAA to make random physical visits of TrueCar's facilities, and require its employees to attend USAA orientations and culture training sessions before they could work on the car buying site. And given the importance of the relationship, TrueCar interacted with USAA on a daily basis, even on the executive level. Given USAA's involvement in TrueCar's business, there is no question TrueCar and its executives were well informed about USAA's decision to significantly redesign the car buying site.

64.     The Individual Defendants also knew about USAA's changes to the co-branded car buying site, given that TrueCar maintained a Disclosure Committee, which would have discussed that critical issue with the Company's senior management and Board during the Relevant Period. The purpose of the Disclosure Committee was to review and ensure the accuracy of the Company's "Disclosure Statements," which included quarterly and annual reports, press releases, earnings guidance, and our financial reports, prior to their filing and dissemination. Defendants Perry, Guthrie, and Pierantoni, in their respective roles as CEO, CFO, and Chief Accounting Officer of TrueCar, were each members of the Disclosure Committee and, in that capacity, were tasked with making periodic inquiries to relevant Company personnel about whether there were any material changes to TrueCar's business that would require disclosure. Such inquiries would have necessarily included inquiries to TrueCar employees who managed the Company's USAA affinity partnership, which accounted for nearly a third of TrueCar's annual revenues, about whether USAA had decided to change anything regarding the car buying site. The Disclosure Committee was also responsible for reviewing and discussing material business concerns with TrueCar's Audit Committee, so USAA's decision to make significant modifications to the car buying site and the impact that would have on TrueCar's business operations would undoubtedly have been shared with the Board.

65.    As detailed in the Securities Class Action complaint (the "Securities Class Action Complaint"), a number of former TrueCar employees confirmed that USAA's decision to implement the redesign of the co-branded car buying site was well known by TrueCar's management and others within the Company during the Relevant Period, since early 2017.[1] Indeed, the Securities Class Action Complaint references numerous statements made by Confidential Witnesses regarding TrueCar's internal operations, its close relationship with USAA, the substantial changes made by USAA to the car buying site, and the adverse impact those changes had on TrueCar's financial health and growth prospects.[2]

66.    Specifically, the Securities Class Action Complaint includes the following allegations regarding the widespread internal knowledge at the Company of USAA's changes to the co-branded website, and the negative impact on the Company's unit sales and revenues:

a.    CW 1, a former Consumer Support Specialist at TrueCar from March 2015 through March 2017 who was responsible for helping customers purchase cars through TrueCar's car buying site with USAA, described how, in late January 2017, she and numerous staffers from TrueCar's Consumer Support department were specifically informed by TrueCar's Consumer Support management during an internal meeting that USAA had decided to significantly redesign the co-branded car buying site, and that such redesign would cause a dramatic negative impact on the Company's business.

Securities Class Action Complaint ¶ 40.

b.    The meeting occurred at the Company's Austin, Texas office, where CW 1 was based, and which primarily handled customer service and sales for TrueCar's affinity clients, including USAA. Indeed, according to USAA's Services Agreement with TrueCar, the call center at the Company's Austin office was devoted to responding to calls from TrueCar customers who were USAA members. Additionally, and as set forth above, Brian Skutta, the Executive Vice President of Dealer Sales and Services at TrueCar, and Bernie Brenner, co-founder of TrueCar and Executive Vice President of Business Development and Strategy—including the

---

[1] The Amended Class Action Complaint for Violations of the Federal Securities Laws and Jury Trial Demand, filed in the Securities Class Action on August 24, 2018.

[2] Each Confidential Witness ("CW") described in the Securities Class Action Complaint is referenced in the feminine form to maintain confidentiality.

management of TrueCar's affinity partnerships—were based in the Company's Austin, Texas office.

Securities Class Action Complaint ¶ 41.

c.      According to CW 1, the meeting was led by Adrienn Colbert and Michelle Brazil, Consumer Support "Team Leads" at TrueCar who were responsible for guiding and monitoring the Consumer Support staffers in their dealings with USAA members. Brandie Aldrich, former Senior Manager of Consumer Support at TrueCar and to whom Colbert and Brazil reported, also attended the meeting. Aldrich reported to Wendy Tanner, former Vice President of Dealer and Consumer Support, who reported to Paul Edmonds, Senior Vice President of Dealer Marketing and Operations, who reported to Defendant Perry. CW 1 recalled that other attendees included, among others, Consumer Support staffers Janey James, Edgar Sanchez, Patrice Love, Raymond Gonzales, and CW 4.

Securities Class Action Complaint ¶ 42.

d.      At the meeting, Colbert and Brazil informed Consumer Support staffers that USAA had decided to significantly redesign the car buying website with TrueCar by requiring USAA members to answer a series of additional questions pertaining to their personal budgets and finances before they could access the car buying site. CW 1 recalled that the particular changes USAA had decided to implement were shown via a "slide" or "presentation" providing specific "examples" of the questions that USAA would add, and that handouts were also provided. "They (Colbert and Brazil) showed a mock of what the types of questions would look like." Colbert and Brazil explained that TrueCar "was informed by USAA of the change," which USAA hoped would "match them [USAA members] better for what the member makes [earns]" and "push USAA members to use [USAA's] credit union for financing."

Securities Class Action Complaint ¶ 43.

e.      CW 1 recalled that a main focus of the January 2017 meeting was to prepare Consumer Support staffers for the known negative impact USAA's significant changes to the car buying site would have on TrueCar's customers and business. In particular, CW 1 stated that it was understood by CW 1 and stated by others at the meeting, including senior managers, that the USAA website changes would not be well-received by USAA members and would have an adverse effect on TrueCar's bottom line. CW 1 stated that this was because the additional steps USAA was adding, and the nature of the questions, were going to deter USAA members from wanting to continue to use the car buying site. CW 1 recalled that Colbert and Brazil stated at the meeting that USAA members would resist the additional questions, which would require USAA members to disclose "sensitive and personal" financial information, causing web traffic to "run slower." CW 1 stated that Colbert and Brazil commented: "People [USAA members] are going to be upset [about the changes]. Don't be surprised when you start receiving more calls [from USAA members]." In fact, CW 1 stated that Consumer Support staffers were provided with specific templates (called "Call Flow Sheets") that were designed to address

sample complaints that were expected to be raised by USAA members in response to the changes. The staffers were told to submit these reports online via the "Call Flow Sheets" to Colbert and Brazil, who would in turn forward them to the Company's Escalation Department, headed by Chad Cravens, at TrueCar's headquarters in Santa Monica. Colbert and Brazil stated that TrueCar was "going to go through some rough times, but USAA is our biggest customer and we have to obey," as TrueCar could not "afford to lose the account."

Securities Class Action Complaint ¶ 44.

f.     Significantly, CW 1 stated that this was not the only internal meeting held at TrueCar about USAA's significant redesign of the car buying website. Rather, there were "numerous" internal meetings taking place in or around January 2017 in which management from each department informed their staffers of the significant changes USAA was making to its car buying website with TrueCar.

Securities Class Action Complaint ¶ 45.

g.     CW 4, another former TrueCar Consumer Support Specialist in the Company's Austin, Texas offices from December 2015 through mid-November 2017, provided an independent account corroborating the timing and substance of the internal meeting attended by CW 1. CW 4 stated that, in early 2017, Colbert and Brazil, who were Consumer Support Team Leads, informed her and other Consumer Support staffers at an internal meeting at the Company's Austin, Texas office that USAA had decided to implement significant changes to its website later that year, and that those changes would consist of additional questions to USAA members about their personal budgets. CW 4 likewise stated that it was generally understood at this meeting that these changes would not be well-received by USAA members and would have an adverse effect on TrueCar's bottom line.

Securities Class Action Complaint ¶ 46.

h.     CW 4 explained that because USAA is a vital customer for TrueCar and "dictates our company," USAA controlled TrueCar customer support procedures for USAA members. CW 4 stated that, as a result, at the meeting led by Colbert and Brazil—and as also described by CW 1—Consumer Support staffers were provided with a "template," or "Call Flow Sheet," that they were instructed to follow for expected USAA member complaints in response to the USAA website redesign. Colbert instructed Consumer Support staffers to "make sure you are careful (when dealing with upset USAA members)" and "stick to the script" that was provided.

Securities Class Action Complaint ¶ 47.

i.     CW 5, another former Consumer Specialist for TrueCar in the Company's Austin, Texas offices from November 2015 through November 2017, also independently corroborated the internal meetings described by CW 1 and CW 4. CW 5 stated that, around early February 2017, Sigourney Samaripa, the Consumer Support Team Lead for CW 5's

24

team and who was also a USAA member, informed CW 5 of USAA's significant redesign of the car buying website, and also informed her of the precise changes that USAA was making—namely, requiring USAA members to answer a series of additional questions pertaining to USAA members' monthly expenses and details about car ownership. Through conversations with Samaripa and Colbert, CW 5 learned of the meeting that had taken place earlier that year in which Colbert and Brazil issued warnings to Consumer Support staffers on the expected negative response from USAA members in connection with USAA's changes to the car buying website. CW 5 alsobelieved that an email had been circulated to Consumer Support staffers by the Team Leads informing them of the same. CW 5 stated that "it was clear from the beginning" that the USAA's website changes were "intrusive" to USAA members and "would not be good" for TrueCar.

Securities Class Action Complaint ¶ 48.

j.      Former employees also confirmed that, on the technological side, TrueCar would have been informed of any changes to the car buying website it maintained for USAA months before those changes were "made live." CW 2, a former Senior Partner Development Manager at TrueCar's offices in Santa Monica from February 2016 through August 2016 who managed over 180 affinity partner relationships at TrueCar, stated that—based on her attendance at bi-weekly and monthly Partner Development team meetings at TrueCar's Santa Monica offices led by Pributsky, who managed the affinity relationship with USAA—TrueCar's creative team worked closely with USAA on the car buying site, and would have been involved in any process to change the site since it was "owned and operated by TrueCar." CW 2 further stated that the significant changes to the website that USAA implemented here—*i.e.*, adding several additional pages to the car buying process consisting of questions requiring data input from users— would have taken at least "months to add," and would have required countless meetings and "lots of testing before it was made live" so both parties could give input.

Securities Class Action Complaint ¶ 49.

k.      CW 6, a former Software Engineer for TrueCar's mobile apps who worked in the Company's Austin, Texas offices from November 2015 through March 2018, stated that Marco Santini, his supervisor and current Senior Director of Development at TrueCar, attended "numerous meetings" with individuals from USAA throughout early to mid-2017. Santini reported to Chris Denend, Senior Vice President of Software Engineering who was based in the TrueCar's Santa Monica offices, who reported to Tommy McClung, current Chief Technology Officer, who reported to Defendant Perry.

Securities Class Action Complaint ¶ 50.

67.     The foregoing factual allegations confirm that during the Relevant Period, the

Individual Defendants knew of USAA's substantial modifications to the co-branded car buying

site and that those changes would have a material adverse impact on TrueCar's unit sales and revenue growth, once they were implemented.  But while USAA's decision to implement a "significant website redesign" was well known by the Individual Defendants and others at TrueCar as early as January 2017, the Individual Defendants did not inform the investing public that this highly significant risk – for which the Company had previously provided specific warnings – had actually materialized and was adversely impacting TrueCar's business during the Relevant Period. Instead, investors were presented with the exact opposite impression: that no such risk had transpired, and that the Company's affinity partnership with USAA was poised to generate record and accelerating unit and revenue growth for TrueCar in 2017 in excess of 20%, even as Defendants knew that such growth would not and could not occur.  And notably, at the same time Defendants inflated TrueCar's stock price with their misrepresentations, Defendants Guthrie and Pierantoni and other Company insiders sold substantial amounts of TrueCar stock, obtaining tens of millions of dollars in proceeds from their illicit trading activities.

  **C.**  **The Individual Defendants Caused TrueCar to Make Materially False and Misleading Statements During the Relevant Period**

  68.  Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements, or otherwise failed to disclose material adverse facts about the Company's business, operations, and growth prospects, which were known at the time to the Individual Defendants, and/or recklessly disregarded by them.  The Individual Defendants were responsible for concealing from investors the fact that USAA had decided to undertake a significant redesign of the car buying site that it shared with TrueCar, as well as the materially adverse impact that the redesign would have on the Company's unit sales and revenues once it was implemented in June 2017.

69.     On February 16, 2017, the Individual Defendants caused the Company to issue a press release, filed on Form 8-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and full year ended December 31, 2016 (the "Q4 2016 Press Release").  The Q4 2016 Press Release reported that total revenue for the fourth quarter of 2015 was up 17% from the previous year to $74.1 million, and full year 2016 revenues were up 7% from the previous year to $277.5 million.  The Q4 2016 Press Release emphasized growth in the future, stating in relevant part:

> "We have come a long way in the year since I joined TrueCar, and we are excited about re-accelerating our top-line growth while also improving our margins.  At this point, I am very confident that we now clearly understand and have our hands placed securely on the practical levers that we believe will enable us to continue to drive *double-digit rates of unit and revenue growth for some time*," said Chip Perry, TrueCar's President and Chief Executive Officer.

> "We are pleased with the financial results in the fourth quarter of 2016," continued Mike Guthrie, TrueCar's Chief Financial Officer. "*We have set the stage for strong growth and margin expansion over the next few years*."

70.     Also, on February 16, 2017, the Individual Defendants authorized TrueCar to host a conference call with investors and analysts to tout the Company's Q4 2016 results.  During the call, Defendant Guthrie responded to a question from an analyst about the Company's relationship with USAA by conveying there was even more room for growth from the USAA partnership, stating in relevant part:

> As we look at the USAA channel, we had great growth in the fourth-quarter.  We had a record in the month of December.  And as I said in the call, we're 11 years into the partnership, and still think there is quite a bit that we can do together with our partners at USAA, to continue to make car buying better and better for their members.  And so, even though that's a very large channel, we still look at the penetration rates there, and we know that they're reasonably low.  So it's on new car and used car, so there's much more work to do there.

71.     On February 28, 2017, the Individual Defendants authorized certain members of TrueCar's senior management to attend and present at the JMP Securities Technology

Conference.  During this conference, Defendant Perry further emphasized the importance of TrueCar's relationship with USAA, stating: "we also have a partner affinity business, with USAA being our largest partner . . . That affinity channel in the last fiscal year really started to grow pretty substantially . . . . ***And as we really look at where the unit growth comes from next year, we absolutely expect all of our channels to grow and grow nicely, TrueCar branded, USAA.***"

72.     Investors and analysts reacted very favorably to these representations.  For example, a Morgan Stanley report entitled: "TRUEly a Good Quarter" stated that "USAA grew 16% y/y, the fastest since 2015.  We view these channels as key drivers to profitable growth as they . . . play a outsized role in driving future earnings growth."  In addition, Craig-Hallum Capital Group LLC issued a report entitled: "TRUE Continues To Exceed Expectations And We See A Path To A Much Larger (And More Profitable) Company.  Raising Price Target To $20," raising its target price for TrueCar from $14 to $20 per share, and commenting that: "New CEO Chip Perry has overseen a number of changes that appear to have radically changed [TrueCar's] direction, including . . . refocusing on the highly profitable affinity channel."  RBC Capital Markets also issued a report commenting that the Company's overall unit growth of 19% was its "fastest growth in five quarters," and that its "unique visitor" growth, which measured TrueCar's overall web traffic, was expected to be driven by the Company's "key relationship with USAA."

73.     On March 1, 2017, the Individual Defendants caused the Company to file its Form 10-K with the SEC for the year ended December 31, 2016 ("2016 10-K").  The 2016 10-K was signed by Defendants Perry, Guthrie, Pierantoni, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Nichols, and Yadigaroglu.   The 2016 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were signed by Defendants Perry and Guthrie,

stating that the information contained in the 2016 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act.  Moreover, Defendants Perry and Guthrie each signed a separate certification, in which they affirmed the following:

1. I have reviewed this Annual Report on Form 10-K of TrueCar, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

74. The 2016 10-K explained how "a significant reduction in the number of cars purchased . . . by members of [TrueCar's] affinity group marketing partners would reduce [the Company's] revenue and harm [TrueCar's] operating results," and stated the following:

> [S]everal aspects of our relationship with affinity groups might change in a manner that harms our business and financial performance, including: . . . affinity group marketing partners might de-emphasize the automobile buying programs within their offerings, resulting in a decrease in the number of transactions between their members and our TrueCar Certified Dealers . . . . If our relationships with affinity group marketing partners change our business, revenue, operating results and prospects may be harmed.

75. Also, in describing how "[a]ny adverse change in our relationship with United Services Automobile Association, or USAA, could harm our business," the 2016 10-K stated:

> USAA has broad discretion in how the car-buying site we maintain for USAA is promoted and marketed on its own website. Changes in this promotion and marketing have in the past and may in the future adversely affect the volume of user traffic we receive from USAA. Changes in our relationship with USAA or its promotion and marketing of our platform could adversely affect our business and operating results in the future.

76.     The 2016 10-K further represented that if USAA were to use its broad discretion to change the car buying website in a way that "deemphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed:

> [C]hanges in how USAA promotes and markets the car-buying site we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by  USAA members. For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform. Should USAA or one or more of our other affinity group marketing partners decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed.

77.     During the Relevant Period, while the Individual Defendants were concealing the USAA's significant redesign of the co-branded car buying site, TrueCar undertook a secondary public offering, selling over a million shares of Company to investors at artificially inflated prices. Specifically, on April 26, 2017, TrueCar completed the Secondary Offering of 10.35 million shares of TrueCar common stock at an offering price of $16.50 per share, generating approximately $170,775,000 million in total gross proceeds.  In the Secondary Offering, USAA sold 3,132,343 of its 12,175,333 beneficially-owned shares, reducing its beneficial ownership in the Company from 13.6% to 10.4%, for proceeds of approximately $51.7 million.

78.     In addition, entities affiliated with TrueCar Directors Dietz, Yadigaroglu, and Agrawal sold substantial amounts of TrueCar stock in the Secondary Offering, collectively selling approximately 5.6 million shares of Company stock and collecting more than $90 million in proceeds, or over 50% of total proceeds from the Secondary Offering.  Defendant Perry, Guthrie and Pierantoni did not sell in the Secondary Offering, but that was because they were subject to a 90-day Lock-Up Period that prevented them from selling any shares until July 25, 2017, as detailed below.

79.     The Registration Statement for the Secondary Offering was signed by Defendants Perry, Guthrie, and Pierantoni.  In the Company's offering documents, the Individual Defendants caused the Company to make the same misrepresentations made in the Company's 2016 10-K, as described above, regarding the Company's relationship with USAA and changes to USAA's platform and marketing efforts.  These statements continued to be false and misleading.

80.     Additionally, the offering documents for the Secondary Offering incorporated by reference the Company's 2016 Form 10-K and February 16, 2017 Form 8-K, which included the Company's fourth quarter and full year 2016 earnings press release.  Accordingly, the false and misleading statements included in the Company's 2016 Form 10-K and fourth quarter and full year 2016 earnings press release were incorporated by reference therein.  These statements continued to be false and misleading.

81.     On May 9, 2017, the Individual Defendants caused the Company to issue a press release, filed on Form 8-K with the SEC, announcing the Company's financial and operating results for the first quarter ended March 31, 2017 (the "Q1 2017 Press Release").  The Q1 2017 Press Release reported strong financial results, including first quarter total revenue up 22% from the previous year to $75.8 million, and Defendant Guthrie stated: "After just completing our successful public offering, we are pleased with the financial results in the first quarter of fiscal 2017 and *the momentum we are building as we head into the seasonally strongest part of our year*."

82.     During TrueCar's first quarter earnings call held the same day, Defendant Guthrie touted the Company's "successful public offering," and celebrated the Company's accelerating unit growth after its "return[] to double-digit growth rates on units and revenue in Q4 of last year." Guthrie further represented that TrueCar was "now generating 20% plus growth on the top-line,"

with overall revenue growing 22% and units growing a record 24% compared to the first quarter

the prior year.  Guthrie further emphasized the Company's positive future prospects and growth

by stating: "While we still have plenty of work to do, I'm pleased to say that we are starting 2017

with significant momentum."

83.     The Individual Defendants also raised TrueCar's unit and revenue guidance, while

continuing to highlight USAA as a "great grower" for the Company.  Specifically, Defendant Perry

made the following representation:

> We would certainly be remiss if we didn't call out the partner organization of
> TrueCar over the last few quarters.  They had a great first quarter.  The unit numbers
> coming out of our partner channel both USAA, which had really healthy growth of
> 16% in the first quarter, we did 16% in the fourth quarter on a year-over-year basis
> at USAA, in a year where the growth rate was only 8%.  So that's been a great
> grower for us.

84.     Investors and analysts continued to react positively to these statements.  For

example, an analyst from Stephens Inc., issued a research brief raising TrueCar's price target from

$17 per share to $22 per share, stating: "TRUE posted solid 1Q17 results that were in-line with the

update they gave around a recent follow-on offering and upped guidance for 2017.  All three

channels (TrueCar, USAA, and other affinity partners) and essentially all of TRUE's operating

metrics were solid in the period, and we believe strong results in the seasonally strong 2Q/3Q

periods and credible plans to expand TRUE's business model will continue to move the stock

higher."  Moreover, an analyst from RBC Capital Markets reported that "[r]esults were strong and

TRUE raised its FY17 guide more than the Q1 beat," stating "importantly units continued to

accelerate" at a "record Q1 level" in excess of 20%.  An analyst from Craig Hallum also issued a

report raising the target price for TrueCar from $20 per share to $23 per share and stated that Q1

marked a "return to 20+% y/y revenue growth."

85.     On May 10, 2017, the Individual Defendants caused the Company to file its Form 10-Q with the SEC for the first quarter ended March 31, 2017 (the "Q1 2017 10-Q").  The Q1 2017 10-Q was signed by Defendants Perry, Guthrie, and Pierantoni, and contained certifications, signed by Perry and Guthrie, that were similar to the certifications described in ¶ 73, attesting to the accuracy and completeness of the financial report.  The Q1 2017 10-Q contained essentially the same misrepresentations made in the Company's 2016 Form 10-K, as described above in ¶¶ 74-76, regarding the Company's relationship with USAA and changes to USAA's platform and marketing efforts.  These statements continued to be materially false and misleading.

86.     Just as USAA had decided in early 2017, TrueCar moved forward with the implementation of USAA's redesign of the co-branded car buying website.  Pursuant to USAA's redesign, USAA members were then required to go through a number of additional steps before being able to access the TrueCar platform, including answering a series of questions requesting sensitive personal and financial information about their credit and monthly budgets.

87.     As detailed in the Securities Class Action Complaint, a number of former TrueCar employees confirmed that the Company's business operations and financial performance were adversely impacted by USAA's redesign of the co-branded car buying, right after the changes were implemented.   Specifically, the Securities Class Action Complaint includes the following information provided by Confidential Witnesses concerning the redesign's impact on TrueCar's business:

a.      CW 4, a former TrueCar Consumer Support specialist from December 2015 through mid-November 2017, stated that, by June 2017, she witnessed a spike in USAA complaints specifically relating to the additional questions pertaining to members' personal budgets.  These complaints were documented internally and routed to the Company's Escalation Department at TrueCar's headquarters in Santa Monica via the online "Call Flow Sheets."

Securities Class Action Complaint ¶ 64.

     b.      CW 6, a former TrueCar Software Engineer from November 2015 through March 2018, stated that in early summer 2017, his superior—Marco Santini, the Director of Development at TrueCar—told CW 6's team, which was responsible for development of TrueCar's mobile apps, that "pipeline numbers (for the USAA account) are down." Following this meeting, and leading up to the November 6, 2017 earnings call, CW 6 and other team members received periodic updates from Santini about the USAA account's continued poor performance, which were provided both verbally and through the Company's internal communications system (Slack).

Securities Class Action Complaint ¶ 66.

     c.      CW 7, a former Support Analyst for TrueCar from January 2016 through February 2018, also stated that, within a few weeks of the rollout of the USAA website changes, she witnessed "significantly less traffic" through TrueCar's website due to USAA members opting not to purchase vehicles through USAA/TrueCar.

Securities Class Action Complaint ¶ 67.

     d.      Finally, CW 8, a former Consumer Support Specialist for TrueCar in the Company's Austin, Texas offices from October 2016 through December 2017, stated that, following implementation of USAA's changes to the car buying website—which she stated occurred in "early 2017"—she witnessed a sudden increase in complaints coupled with a reduction in USAA user traffic. Significantly, CW 8 further stated that she attended a "fireside" Company-wide meeting in August 2017, which Defendant Perry attended, discussing the downward trend in user traffic to the USAA car buying website.

Securities Class Action Complaint ¶ 68.

     88.     Moreover, as detailed in the Securities Class Action Complaint, TrueCar's management and employees had "real time" or contemporaneous access to declines in web traffics and sales from USAA. Indeed, Confidential Witnesses referenced in the Securities Class Action Complaint provided the following information:

     Specifically, CW 9, a former Director of Trade Operations from February 2017 through March 2018 at TrueCar's office in Austin, Texas, stated that TrueCar leadership—including CW 9—had real time access to monitor website traffic, leads and sales on affinity partner sites, including the USAA account, via the internal database known as "Dashboard." CW 4 also stated that TrueCar staffers had real time access to this information through "Dashboard." CW 3, a Technical Product Manager for TrueCar from November 2015 through June 2017, similarly stated that

"Dashboard" allowed TrueCar staffers to monitor in real time the amount of "clicks" and purchases made through the TrueCar car buying website as well as affinity partner sites. Additionally, CW 5 stated that "Turbo System" was another internal database utilized internally at TrueCar that likewise provided "real time" verifications of vehicle purchases by USAA members from TrueCar Certified Dealers.

Securities Class Action Complaint, ¶ 69.

89.     Furthermore, Defendant Guthrie himself had acknowledged during the May 25, 2017 investor call that TrueCar Certified Dealers gave the Company direct access to their "dealer management software," which showed all car sales at the dealership in real time, including for the Company's affinity partner sites: "What that allows us to do is see every transaction that flows through the dealership.  We know every transaction that comes through either our branded business or through our affinity business."

90.     By mid-July 2017 – at which point, unbeknownst to investors, the fallout from the USAA website redesign was well underway – TrueCar's stock peaked at its Class Period high of $21.75 per share, or 64% higher than its price at the beginning of the Relevant Period (when the stock was at $13.24 per share).

91.     Soon thereafter, on July 25, 2017, the 90-day Lock-Up Period which Defendants Guthrie and Pierantoni were subject to as part of the April 26, 2017 Secondary Offering expired. Notably, the day after its expiration, Defendants Guthrie and Pierantoni began to sell off much of their personally-held shares of TrueCar stock—which the stock was trading at a record high (between $19-$21 per share).  Other members of TrueCar's senior management, including Chief Marketing Officer Neeraj Gunsagar and General Counsel Jeffrey Swart, also sold their TrueCar shares during this period as well.  Collectively, within the week after the Lock-Up Period expired, these Company officers sold nearly 1 million TrueCar shares and collected approximately $19 million in gross proceeds.

92.     Most glaringly, Defendant Guthrie, the Company's CFO who was in charge of monitoring TrueCar's unit sales and revenues, was the largest insider seller.  Guthrie sold approximately 737,916 of his TrueCar shares—over half of his total holdings (54%)— within days of the Lock-Up Period expiring, realizing nearly $14 million in gross proceeds on his own.

93.     While these Company insiders were illicitly profiting from their sell-off of TrueCar shares, the Individual Defendants continued to conceal the impact of USAA's redesign of the co-branded car buying website.  On August 8, 2017, the Individual Defendants caused the Company to issue a press release, filed on Form 8-K with the SEC, announcing the Company's financial and operating results for the second quarter ended June 30, 2017 (the "Q2 2017 Press Release").  The Q2 2017 Press Release reported strong financial results, including second quarter total revenue up 23% from the previous year to $81.8 million, and Defendant Perry stated: "***The momentum that we have been building over the past few quarters at TrueCar is continuing quite nicely.  We're growing well; we're delivering value to consumers, dealers and manufacturers; we're expanding our business; and we're producing operating leverage all while making key investments for the long term.***"

94.     These statements were false and misleading when made, since the Individual Defendants were aware that USAA had already significantly redesigned the co-branded website, and website traffic and resulting sales were already affected.

95.     The Q2 2017 Press Release also updated the Company's guidance for the third quarter and full year 2017, stating:

TrueCar's guidance for the third quarter ending September 30, 2017 is as follows:

- Units are expected to be in the range of 265,000 to 270,000.

- Revenues are expected to be in the range of $85.0 million to $87.0 million.

- Adjusted EBITDA is expected to be in the range of $7.0 million to $8.0 million.

Guidance for the full year ending December 31, 2017 is as follows:

- Units are expected to be in the range of 975,000 to 985,000.

- Revenues are expected to be in the range of $325.0 million to $329.0 million.

- Adjusted EBITDA is expected to be in the range of $26.0 million to $28.0 million.

96.     That same day, on August 8, 2017, the Individual Defendants caused TrueCar to host a conference call with investors and analysts to discuss the Company's financial results and guidance.  During the call, Defendant Guthrie reassured investors about the Company's continued growth for 2017, stating:

> It's been a great first half of 2017, and we're excited about continuing to expand and grow our business in the second half. . . .  [O]ur dealer network is able to close on a record number of end market prospects generated by our TrueCar branded channel, USAA and other high-growth partners such as Chase and Sam's Club.

97.     Also, on the Q2 2017 earnings call, Defendant Guthrie discussed the increased guidance for third quarter 2017, stating: "And finally, *we are already seeing signs of high unit growth rates as our July results come in. As a result, we expect Q3 units to be in the range of 265,000 to 270,000 or 20% to 22% year-over-year growth*."

98.     Responding to a question from an analyst, Guthrie further represented that there was a "continued strong growth in units," as follows:

> Of all the metrics, I'd say I don't think we could be much happier about the unit numbers than we are.  And we just have really produced really fantastic unit growth.  We're seeing, as the third quarter starts, continued strong growth in units that's embedded in the guidance that we gave you on units and it's embedded in the guidance that we gave on units for the year as a whole in addition to Q3.

99.     The next day, on August 9, 2017, the Individual Defendants caused the Company to file its Form 10-Q with the SEC for the second quarter ended June 30, 2017 (the "Q2 2017 10-Q").  The Q2 2017 10-Q was signed by Defendants Perry, Guthrie, and Pierantoni, and contained signed certifications pursuant to SOX by Defendants Perry and Guthrie, stating that the information contained in the Q1 2017 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.  Although USAA had already implemented what the Company called a "significant website redesign"—the Q2 2017 10-Q continued to deceptively warn of the "risk" that if USAA were to change the co-branded car buying site at some point "in the future," the Company's business would be significantly harmed.  That "risk" had in fact already materialized.

100.    The Individual Defendants continued to make materially false and misleading statements during the third quarter of 2017.  On September 7, 2017, Defendants Guthrie and Perry presented at the Citi Global Technology Conference.  Defendants Guthrie and Perry emphasized the importance of unit growth and how it was a vital metric that was closely followed.  In addition, Defendant Perry represented that TrueCar's unit growth would continue, stating: "unit growth is really the most important metric in our business because – and ***you're seeing that grow in the mid-20% range now. We'll continue to grow nicely because of conversion and closed rate improvements***."  Moreover, in discussing how Defendants "do a fairly good job forecasting units" and are "more focused on the units side of our business, especially in the last 1.5 years to 2 years," Defendants Perry and Guthrie both assured investors that "units are growing nicely."

101.    The Individual Defendants caused the Company to falsely tout the robustness of TrueCar's growth prospects to analysts and investors.  However, the Individual Defendants were

aware that USAA would be redesigning the co-branded website, and that these changes would have a severe adverse effect on consumer website traffic and unit sales. USAA was the Company's most important partner, accounting for 32% of all units in 2016, and the Defendants had "real time" access to the decline in USAA website traffic and unit data.

102.    The market responded positively based on the foregoing false and misleading statements issued by the Individual Defendants regarding the Company's business, operations, and prospects, and the Company's stock traded at artificially-inflated prices throughout the Relevant Period, with the common stock reaching a high of $21.75 per share on July 17, 2017.

## V.    REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE IMPROPER

103.    The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period, but concealed from the investing public, were as follows:

a.      USAA, the Company's largest and most important affinity partner, had decided to make significant changes to the co-branded car buying site that it shared with TrueCar in early 2017, and that those changes would be formally implemented in June 2017;

b.      USAA's significant redesign of the co-branded car buying site would have a material adverse effect on the volume of unit sales generated by USAA;

c.      As a result, TrueCar's growth and revenues would be adversely affected; and

d.      Based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

104.     As a result of the Individual Defendants' false and misleading statements and omissions, TrueCar shares traded at artificially-inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically.

## VI.     THE TRUTH EMERGES

105.     When TrueCar released its third quarter results on in early November 2017, the Individual Defendants were forced to reveal that USAA's significant changes to the car buying website had profoundly and negatively impacted TrueCar's business, units, and revenues. Specifically, on November 6, 2017, the Company disclosed that sales of USAA units had declined by 5%, and that after 18 consecutive quarters of growth exceeding 30% in used car sales, unit sales in third quarter 2017 grew only 16%.  The Company also lowered its 2017 annual guidance, after raising it just three months earlier.

106.     On the same day, the Company held a conference call to discuss its financial results. On the call, Defendant Perry attempted to downplay the disappointing results, but also admitted that the website redesign by USAA had affected the Company's revenues, stating in relevant part:

> While I'm generally pleased with our execution in the third quarter, we did have our challenges.  Recently, USAA launched a significant website redesign. . . . [T]he new USAA Car Buying experience has introduced several new steps in the process and new content related to total cost of [car] ownership before the member is linked to the Car Buying Service powered by TrueCar. . . . For Q3 . . . we saw a decline in traffic, prospects and units [for] USAA.

107.     During the call, Defendant Guthrie confirmed that USAA's website changes affected consumer traffic and, therefore, sales:

> If you just look at the numbers and it's really clear.  I think we really had [] a traffic issue as Chip [Perry] was saying.   Whether very well financially qualified or not, all of the [USAA] members went through an experience that made it much more difficult to get through the car buying service.   And so if you look at traffic versus prospects versus units, a very, very large decline in traffic, much smaller in terms of the declines in prospects and only 5% down on units.

41

108.    Importantly, Defendant Perry also acknowledged that the Individual Defendants were aware that USAA would be making these material changes to the website experience, stating:

> So the changes in the [USAA] user experience involved inserting some steps, questions and also content related to vehicle affordability and cost of ownership. So we saw these coming.  It wasn't like we were blind to them.

109.    During the call, Defendant Perry also claimed that TrueCar and USAA did not realize the "downward effect on our numbers" until after the website changes were launched, but earlier statements by the Company confirm that the Defendants either knew or were reckless in disregarding the effect that this website redesign would have.  The Company's 2016 10-K disclosure and other quarterly reports filed with the SEC had explicitly acknowledged that if USAA were to change the website "***our revenue, business and financial results will be harmed***."

110.    Also, when asked by an analyst "when exactly within the quarter did the USAA shortfall hit the numbers," Defendant Guthrie admitted that "[w]e really started to see [the shortfall] in August"—the same month Guthrie had told investors during the August 8, 2017 2Q earnings call that "[w]e're seeing, as the third quarter starts, continued strong growth in units." Guthrie further admitted that TrueCar and USAA, as part of their affinity relationship, worked closely together in determining what would occur with regard to the co-branded website, making clear that TrueCar could not have been ignorant to the website changes. Specifically, Guthrie stated: "We don't have any dealings without [USAA's] consent," and "[w]e work with them on a daily basis and we're well-connected."

111.    Based on these bombshell revelations, TrueCar's investors began selling the Company's stock, and the stock price sharply declined by over 35%, or $5.76 per share, to close at $10.58 per share on November 7, 2017, erasing millions of dollars in market capitalization.

112.    Analysts were critical of TrueCar's belated disclosure related to the negative effects of USAA's changes to the TrueCar co-branded website and questioned the Company's long-term

growth plans.  For example, a report from Morgan Stanley observed that the website changes had led to decreases in unique visitors, prospects, and units sold, and further noted that unique visitor growth was only 1%, "the slowest quarterly growth since 2013 (as far back as we have)."

113.   Statements by the Individual Defendants have continued to confirm that the website redesign by USAA had a significant impact on the Company's revenues.  At the RBC Capital Markets Technology conference on November 8, 2017, Defendant Perry made additional comments about the "friction" that the changes caused between consumers and the Company, stating:

> A big chunk of the audience that makes [TrueCar] number one is a flow of car buyers that come from USAA . . . and what they did in the third quarter was put in place a new experience layer on their side related to advising members about what kind of car they should buy and including a lot of [information on] car affordability. So it put some friction that didn't used to exist between us and them.

114.   On February 1, 2018, the Individual Defendants caused the Company to file a report on Form 8-K with the SEC, announcing that Defendant Guthrie had resigned on January 28, 2018 "for personal reasons."  Guthrie agreed to provide consulting services to the Company for an additional four months, during which time he would continue to receive equity awards.  Defendant Pierantoni assumed the role of the Company's Interim CFO. On April 4, 2018, the Individual Defendants caused TrueCar to file a proxy statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2018 Proxy").  The 2018 Proxy omitted material information concerning the Company's true financial performance, and did not disclose the Company's inadequate internal controls that led to the Board approving compensation awards based on inflated levels of performance.

115.   Throughout 2018, the Individual Defendants caused the Company to issue disappointing quarterly financial results.  The sharp decline in unit growth continued, and although

the Individual Defendants continued to reassure investors that they would soon return to double-digit revenue growth, the Company has not been able to recover.

116.    On October 29, 2018, the Company filed a report on Form 8-K with the SEC, announcing that Defendant Dietz had resigned from the Board and the Compensation Committee on October 25, 2018.  No reason was given for Defendant Deitz's unexpected sudden departure, other than a statement that his "resignation was not due to any disagreement with the Company." In the same statement, the Company also announced that Philip McKoy had been elected to the Board on October 25, 2018.

117.    On February 14, 2019, the Company reported further disappointing results for the fourth quarter and full year 2018.  The company reported net income for the quarter of $2.7 million, or 3 cents a share, missing analyst estimates of 5 cents a share.  Monthly unique visitors to the Company's websites dropped 10% to only 6.5 million, compared with 7.3 million from the previous year.

118.    On the news, TrueCar's stock sank another 22.8% in trading, dropping to only $7.91 per share on February 15, 2019.  By March 19, 2019, TrueCar's stock closed at a low of $6.76.

## VII.   INSIDER SELLING

119.    Not all TrueCar stockholders were harmed by the Individual Defendants' actions. Indeed, some of the Individual Defendants made use of their insider knowledge of the false and misleading statements about the Company's business operations, and handsomely profited from their self-serving insider selling activities.

120.    During the Relevant Period, while in possession of material, adverse, non-public information, Individual Defendants Buce, Guthrie, Pierantoni, and Krafcik—all fully aware of the unlawful circumstances driving the Company's stock to highly-inflated levels—engaged in selling

of their personal stock, collectively unloading a staggering total of at least 853,407 shares of TrueCar common stock for proceeds ***exceeding $16 million.***

121.    Notably, after the Secondary Offering, USAA and Company insiders, including entities affiliated with Defendants Agrawal, Dietz, and Yadigaroglu, sold ***approximately 9.8 million shares***, realizing over 80% of the proceeds of the offering.

122.    These insider sales were executed under highly suspicious circumstances and while the Insider Selling Defendants possessed material, adverse, non-public Company information.

123.    On July 17, 2017, TrueCar's stock price reached its relevant period high of $21.75 per share, which was approximately 64% higher than the stock price in February 2017. Just over one week later, on July 25, 2017, the 90-day lock-up period for the Secondary Offering (the "Lock-Up Period") expired, which allowed Company insiders to begin selling their shares.

124.    On July 26, 2017, the day after the Lock-Up Period expired, TrueCar stock was still trading near its peak value at between $19-21 per share.  Several TrueCar insiders, including Defendants Guthrie and Pierantoni, began selling substantial amounts of their TrueCar shares, and heavy selling continued through October 2017, shortly before the truth about the USAA website changes was revealed in early November 2017.  In addition to Defendants Guthrie and Pierantoni, the selling insiders included Chief Marketing Officer Neeraj Gunsagar, General Counsel Jeffrey Swart,[3] and Brian Skutta, the Company's Executive Vice President of Dealer Sales at TrueCar – *i.e.*, the department directly in charge of monitoring TrueCar's unit sales.

---

[3] Swart, as TrueCar's General Counsel, also served as Co-Chair of the Disclosure Committee, along with Pierantoni.

125.   The volume of sales is significant.   Each of these insiders sold substantial percentages of their TrueCar holdings, and Defendants Guthrie and Pierantoni each sold more than 50% of their total holdings, as shown in the chart below:

| Insider | Total Shares Sold | Total Gross Proceeds | Percentage of Holdings Sold |
|---|---|---|---|
| Guthrie | 737,961 | $13,961,608 | 54% |
| Pierantoni | 62,522 | $1,214,940 | 50% |
| Gunsagar | 171,580 | $3,270,673 | 38% |
| Swart | 34,863 | $690,861 | 26% |
| Skutta | 117,410 | $1,997,228 | 50% |

126.   The insider sales by Guthrie, Pierantoni, Gunsagar and Swart were made pursuant to 10b5-1 trading plans, *i.e.,* plans designed to inoculate insiders from allegations of insider sales by pre-determining the dates for stock sales.   However, these officers simultaneously adopted their 10b5-1 trading plans during the Relevant Period on May 12, 2017 and May 18, 2017, which was months after they knew, or disregarded with deliberate recklessness, that USAA had informed TrueCar about the significant website redesign.   Moreover, these 10b5-1 trading plans permitted the officers to sell unusually large amounts of TrueCar stock as soon as the 90-day Lock-Up Period expired on July 25, 2017.   Although Skutta was also subject to the 90-day Lock-Up Period, he did not sell his TrueCar shares pursuant to a 10b5-1 trading plan.

127.   Furthermore, these trading patterns were historically anomalous.   All of these insiders' sales contrasted starkly with their sales prior to the Relevant Period.   For example, neither Defendant Guthrie nor Swart sold any TrueCar stock in the twelve months before February 2017.   Although Defendant Pierantoni, Gunsagar, and Skutta did sell some of their TrueCar stock in the year prior to February 2017, these sales were on a much smaller scale than their sales listed above.   For example, Pierantoni sold only 3,769 TrueCar shares in November

2016, for gross proceeds of $45,095, versus the staggering $1.2 million in proceeds that Pierantoni obtained from sales of 62,492 TrueCar shares after the Secondary Offering.

128.    Significantly, Defendant Guthrie sold over half of his holdings almost immediately after the Lock-Up Period expired, at prices near TrueCar's highest stock prices during the Relevant Period and reaped approximately $14 million in gross proceeds from his insider sales alone. Defendant Guthrie, as the Company's CFO, had directly made many false statements during the Relevant Period, such as stating that the Company's accelerating unit growth driven by the USAA affinity partnership caused him to raise the Company's unit and revenue guidance twice between February 16 and November 6, 2017, despite his insider knowledge that USAA's website changes would soon go into effect and negatively impact TrueCar's sales and revenues.

129.    In addition to the sales of personal shares as described above, USAA and entities affiliated with Defendants Agrawal, Dietz, and Yadigaroglu profited from large stock sales in the Secondary Offering.  In the Secondary Offering, TrueCar sold 1.15 million shares of common stock, for approximately $18,975,000 in gross proceeds, and the selling stockholders sold 9.2 million shares of common stock for a total of approximately $151,800,000 in gross proceeds.

130.    USAA and its affiliate USAA Property Holdings, Inc. together sold over 3.1 million shares in the Secondary Offering, or approximately 26% of its TrueCar shares, realizing approximately $51.7 million in proceeds, or 34% of the total proceeds of the Secondary Offering.

131.    At all relevant times, Defendant Agrawal was a managing director of Vulcan Capital Growth Equity, LLC ("Vulcan").  In the Secondary Offering, Vulcan sold more than 1.3 million shares of TrueCar stock for proceeds of $21,535,173.

132.    According to the Form 4 filed with the SEC on May 4, 2017 by Defendant Yadigaroglu, 509,459 shares of TrueCar stock were sold in the Secondary Offering for proceeds

of $8,406,074, by entities in which Yadigaroglu shares voting and investment control, including Capricorn Investment Group LLC ("Capricorn Group"), The Skoll Foundation, The Skoll Fund, Capricorn S.A. SICAV-SIF-Global Non-Marketable Strategies Sub-Fund, Capricorn AIP-Private Investment Fund I, LP, HIT Splitter, LP, and Carthage, LP. (collectively, the "Capricorn Group Entities"). Defendant Yadigaroglu has been Managing Principal at Capricorn Group since 2004.

133. According to the Form 4 filed with the SEC on May 4, 2017 by Defendant Dietz, 1.321 shares of TrueCar stock were sold in the Secondary Offering, for proceeds of $21,791,418, by entities connected with Defendant Dietz, including Upfront II, L.P., Upfront GP II, L.P., Upfront II Investors, L.P. and Upfront II Partners, L.P. Dietz is a founding partner of the venture capital firm which was formed in 1996 under the name GRP Partners or Global Retail Partners, and renamed Upfront Ventures ("Upfront") in 2013. Dietz ceased being a partner of Upfront in July 2016.

134. Insider stock sales in August 2017 are also very suspicious, in that the Insider Selling Defendants seemed to be unloading large percentages of their stock holdings shortly before the truth was revealed about TrueCar's disappointing growth and revenues, as shown in the chart below:

| Date | Insider | Shares | Proceeds | Percentage of Holdings Sold |
|------|---------|--------|----------|------------------------------|
| 8/15/17 | Krafcik | 10,000 | $165,500 | 14% |
| 8/18/17 | Buce | 32,999 | $545,999 | 18% |
| 8/23/17 | Yadigaroglu (Capricorn AIP) | 63,232 | $1,036,790 | 42% |
|  | Yadigaroglu (HSLP) | 9,934 | $162,884 | 42% |
| 8/24/17 | Yadigaroglu (Capricorn AIP) | 42,865 | $708,327 | 49% |
|  | Yadigaroglu (HSLP) | 6,735 | $111,326.98 | 49% |
| 8/25/17 | Yadigaroglu (CapricornAIP) | 35,581 | $581,596 | 79% |
|  | Yadigaroglu (HSLP) | 5,590 | $91,372 | 79% |
| 8/28/17 | Yadigaroglu (Capricorn AIP) | 9,678 | $159,625 | 100% |
|  | Yadigaroglu (HSLP) | 1,520 | $25,070 | 100% |
| 8/31/17 | Krafcik | 10,000 | $165,500 | 16% |

135.     The Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of TrueCar (including, *inter alia*, that USAA's website changes would reduce TrueCar's unit sales and revenues), and caused the price of its stock to trade at artificially-inflated prices, while at the same time the Insider Selling Defendants were disposing of tens of millions of dollars' worth of Company stock, in violation of the law and the Company's own insider trading policies.

136.     Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning TrueCar's business, finances, and prospects.  In breach of these duties, the Insider Selling Defendants sold shares at artificially-inflated prices in order to reap personal profits.

## VIII.  DUTIES OF THE INDIVIDUAL DEFENDANTS

137.     Plaintiff brings this action derivatively, in the right and for the benefit of TrueCar, to redress the breaches of fiduciary duty and other violations of law by Defendants.

**Fiduciary Duties**

138.    By reason of their positions as officers, directors, and/or fiduciaries of TrueCar, and because of their ability to control the business and corporate affairs of TrueCar, the Individual Defendants owed and owe the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage TrueCar in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of TrueCar and its stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

139.    Each director and officer of the Company owes to TrueCar and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

140.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of TrueCar, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with TrueCar, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

141.    To discharge their duties, the officers and directors of TrueCar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the Company.  By virtue of such duties, the officers and directors of TrueCar were required to, among other things:

a.      exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.      exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.      when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**Audit Committee Duties**

142.    In addition to these duties, the members of the Audit Committee (Defendants Buce, Claus, and Lantz) owed specific duties to TrueCar under the Audit Committee's Charter, including duties to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

143.    Specifically, according to the Company's Audit Committee Charter, the Audit Committee has primary responsibilities to oversee:

a.      The Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements;

b.      The qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditor");

c.      The performance of the Company's internal audit function;

d.      The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

e.      Risk assessment and risk management; and

f.      The preparation of the report of the Audit Committee required by the rules of the SEC.

144.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct**

145.   The Individual Defendants, as officers and/or directors of TrueCar, were further bound by the Company's Code of Business Conduct (the "Code"), which includes specific rules "designed to deter wrongdoing and to promote" the following conduct and practices:

• honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• full, fair, accurate, timely, and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission, or SEC, and in our other public communications;

• compliance with applicable laws, rules, and regulations;

• the prompt internal reporting of violations of this Code; and

• accountability for adherence to this Code.

146.    The Individual Defendants were required execute a written acknowledgement confirming that they received, reviewed, understood, and complied with the standards, policies and procedures mandated by the Code.

147.    Under the Code, "all directors, officers and employees of TrueCar and its subsidiaries" were expected to follow and adhere to "General Standards of Conduct," including the following relevant rules:

Overview

Honest and ethical conduct is critical to our business. All directors, officers, employees, agents and contractors have a duty to comply with applicable law and to act in an honest and ethical manner.

Compliance with law

You are responsible for complying with all laws, rules, regulations and regulatory orders applicable to the conduct of our business. If you are located or engaging in business outside of the United States, you must comply with laws, rules, regulations and regulatory orders of the United States, including the Foreign Corrupt Practices Act and U.S. export rules and regulations, in addition to the applicable laws of other jurisdictions.  If compliance with this Code ever conflicts with applicable law, you must comply with the law.

You should undertake to acquire knowledge of the legal requirements relating to your duties sufficient to enable you to recognize potential dangers and to know when to seek advice from managers or other appropriate personnel. In some instances, this may include knowing and understanding legal requirements related to antitrust, privacy and data breach, government contracting, export controls and/or immigration compliance.

Violations of laws, rules, regulations and orders may subject you to individual criminal or civil liability, in addition to discipline by TrueCar. Violations may also subject TrueCar to civil or criminal liability or the loss of business.

148.    The Code also contained specific provisions concerning the disclosure, reporting, and dissemination of public information, to wit:

<u>Public communications and filings</u>

TrueCar files reports and other documents with regulatory authorities, including the SEC and Nasdaq. In addition, from time to time TrueCar makes other public communications, such as issuing press releases.

Depending upon your position with TrueCar, you may be called upon to provide information to help assure that TrueCar's public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to TrueCar's public disclosures.

Individuals involved in the preparation of public reports and communications must comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications.

If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Legal or Human Resources Department. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors.

149.    The Code also imposed specific requirements and obligations relating to "Financial Reporting," as follows:

<u>Overview</u>

As a public company, we are required to follow strict accounting principles and standards, to report financial information accurately and completely in accordance with these principles and standards, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law. The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our employees, security holders and other stakeholders.

<u>Compliance with rules, controls and procedures</u>

It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting. If you have responsibility for or any involvement in financial reporting or accounting, you should have an appropriate understanding of, and you should seek in good faith to adhere to, relevant accounting and financial reporting principles, standards, laws, rules and regulations and TrueCar's financial and accounting policies, controls and

procedures. This includes ensuring that all bookkeeping and records comply with the Foreign Corrupt Practices Act where applicable, as explained in greater detail in TrueCar's Anticorruption Compliance Policy and Guidelines. If you are a director-level employee or higher, you should seek to ensure that the internal controls and procedures in your business area are in place, understood and followed.

Accuracy of records and reports

It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have complete, accurate and timely information. False, misleading or incomplete information undermines TrueCar's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy.

Even if you are not directly involved in financial reporting or accounting, you are likely involved with financial records or reports of some kind—a voucher, time sheet, invoice or expense report. In addition, most employees are involved with product, marketing or administrative activities, or performance evaluations, which can affect our reported financial condition or results. Therefore, TrueCar expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.

Intentional misconduct

You may not intentionally misrepresent TrueCar's financial performance or otherwise intentionally compromise the integrity of TrueCar's reports, records, policies and procedures. For example, you may not:

- report information or enter information in TrueCar's books, records or reports that fraudulently or intentionally hides, misrepresents or disguises the true nature of any financial or non-financial transaction or result;

- establish any undisclosed or unrecorded fund, account, asset or liability for any improper purpose;

- enter into any transaction or agreement that accelerates, postpones or otherwise manipulates the accurate and timely recording of revenues or expenses;

- intentionally misclassify transactions as to accounts, business units or accounting periods; or

- knowingly assist others in any of the above.

150.   Furthermore, the Code required the directors, officers and representatives of

TrueCar to "investigate and report potential violations," to wit:

<u>Obligation to investigate and report potential violations</u>

You should make appropriate inquiries if you see, for example:

- financial results that seem inconsistent with underlying business performance;

- inaccurate financial records, including travel and expense reports, time sheets or invoices;

- the circumventing of mandated review and approval procedures;

- transactions that appear inconsistent with good business economics;

- the absence or weakness of processes or controls; or

- persons within TrueCar seeking to improperly influence the work of our financial or accounting personnel, or our external or internal auditors.

Dishonest or inaccurate reporting can lead to civil or even criminal liability for you and TrueCar and can lead to a loss of public faith in TrueCar. You are required to promptly report any case of suspected financial or operational misrepresentation or impropriety.

151.   The Code also mandated specific requirements concerning the disclosure of

information to TrueCar's Audit Committee, as follows:

<u>Keeping the Audit Committee informed</u>

The Audit Committee plays an important role in ensuring the integrity of our public reports.  If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors.  In particular, the Chief Executive Officer and senior financial officers such as the Chief Financial Officer should promptly bring to the attention of the Audit Committee any information of which he or she may become aware concerning, for example:

- the accuracy of material disclosures made by TrueCar in its public filings;

- material weaknesses or significant deficiencies in internal control over financial reporting;

- any evidence of fraud that involves an employee who has a significant role in TrueCar's financial reporting, disclosures or internal controls or procedures; or

- any evidence of a material violation of the policies in this Code regarding financial reporting.

152.    The Code also contained a strict insider trading policy, pursuant to which the Individual Defendants were bound, as follows:

Prohibition on insider trading

You may not directly or indirectly—through, for example, significant others, family members or controlled entities—buy or sell stocks or other securities of TrueCar or any other company based on nonpublic information obtained from your work at TrueCar. In addition, you may not "tip" others by providing them nonpublic information under circumstances that suggest that you were trying to help them make an investment decision. These obligations are in addition to your obligations with respect to nonpublic information generally, as discussed above.

Under U.S. securities laws, it is unlawful for any person who has "material" nonpublic information about a company to trade in the stock or other securities of that company or to disclose such information to others who may trade. Material nonpublic information is information about a company that is not known to the general public and that a typical investor would consider important in making a decision to buy, sell or hold securities. Violations of U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences.

You should be aware that stock market surveillance techniques are becoming increasingly sophisticated, and the probability that U.S. federal or other regulatory authorities will detect and prosecute even small-level trading is significant. Insider trading rules are strictly enforced, even in instances when the financial transactions seem small.

You may not make an unauthorized disclosure of any nonpublic information acquired in the course of your service with TrueCar or misuse material nonpublic information in securities trading. Any such actions will be deemed violations of TrueCar's Insider Trading Policy. All employees should be familiar with that policy. If you have any questions at all about trading in TrueCar's securities, contact the Legal Department for guidance.

153.    Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants as those set forth above.

**Duties Pursuant to the Disclosure Committee Charter**

154. Additionally, certain of the Individual Defendants were vested with specific responsibilities and obligations pursuant to the Company's Disclosure Committee Charter. The Disclosure Committee was enacted to promote the "Company's policy that all public disclosure made by the Company be accurate and complete, fairly present in all material respects the Company's financial condition and results of operations and be made on a timely basis as required by applicable laws and securities exchange requirements." To that end:

> The purpose of the [Disclosure] Committee is to ensure that the information contained in the Disclosure Statements is recorded, processed, summarized and reported accurately to senior management of the Company, including the Senior Officers, as appropriate to allow timely decisions regarding such disclosure. "Disclosure Statements" means, collectively, (a) the periodic and current reports, proxy statements, information statements, registration statements and other information the Company files with or furnishes to the Securities and Exchange Commission (the "SEC"), (b) press releases containing financial information, earnings guidance, information about material acquisitions or dispositions or other information material to the Company's stockholders, (c) correspondence broadly disseminated to stockholders, (d) presentations of financial information or earnings guidance and other presentations to stockholders or the investment community and (e) disclosures relating to the Company's results of operations and financial position or its securities posted to its website or through social media channels.

155. Members of the Disclosure Committee, including Defendants Perry, Guthrie, and Pierantoni, were responsible for assisting TrueCar's management in overseeing the accuracy, completeness and timeliness of the public disclosure made by the Company, and specifically, were obligated to carry out the following tasks:

(a)     Design, adopt and implement appropriate procedures and policies, and monitor the integrity and effectiveness thereof, to ensure (i) accurate and timely collection and reporting of information for inclusion in the Company's Disclosure Statements and (ii) that information is accumulated and communicated to management as appropriate to allow timely decisions regarding such disclosure.

(b)     Establish and review timelines relating to the preparation and filing of the Company's Disclosure Statements.

(c)     Establish as appropriate policies and procedures to ensure relevant Company personnel timely report to the Committee information potentially requiring disclosure.

(d)     Participate in discussions and make recommendations to the Senior Officers regarding decisions related to the materiality of information and the determination of disclosure obligations with respect to Disclosure Statements.

(e)     Establish responsibility and lines of communication throughout the Company's operations and business units for collecting relevant information on a timely basis, including making periodic inquiries with relevant Company personnel possessing information potentially requiring disclosure.

(f)     Review drafts of the Company's Disclosure Statements, including final drafts.

(g)     Meet periodically during the preparation of the Company's quarterly earnings press releases and other Disclosure Statements to discuss disclosure matters and filings made by the Company to ensure completeness and accuracy of content.

(h)     Coordinate, as necessary, the review of Company's Disclosure Statements with the Senior Officers, the Company's independent accountants, internal auditors (if any), outside legal counsel and the Audit Committee (the "Audit Committee") of the Board of Directors of the Company (the "Board").

(i)     Periodically report to the Chief Financial Officer and to the Chair of the Audit Committee on disclosure issues and the Committee's findings regarding the

effectiveness of its procedures and policies, including any weaknesses identified therein or in the Company's disclosure controls and procedures generally.

156.    Upon information and belief, the Company maintained a version of the Disclosure Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants as those set forth above.

## IX.    DERIVATIVE AND DEMAND ALLEGATIONS

157.    Plaintiff brings this action derivatively, in the right and for the benefit of TrueCar, to redress to the injuries suffered, and to be suffered, by TrueCar as a direct result of the breaches of fiduciary duties and other violations of law perpetrated by the Individual Defendants.  TrueCar is named as a nominal defendant solely in a derivative capacity.

158.    Plaintiff will adequately and fairly represent the interests of TrueCar in enforcing and prosecuting its rights, and has retained counsel experienced in litigating this type of action.

159.    Plaintiff was a stockholder of TrueCar common stock at the time of the wrongdoing of which Plaintiff complains, and has been continuously since.

160.    At the time this derivative action was commenced, the Board was comprised of the following nine (9) directors: Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, Yadigaroglu, and non-defendant Phillip McKoy.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Indeed, Defendants Perry, Buce, Claus, Krafcik, Lantz, Nichols, and Yadigaroglu are each named as a defendant in the Securities Class Action and, as such, continue to expose themselves and the Company to civil liability under the federal securities laws.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act for the following reasons:

60

A.      **Demand is Futile as to Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, Yadigaroglu Because Those Directors Face a Substantial Likelihood of Liability**

161.     Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, Yadigaroglu each face a substantial likelihood of liability for their breaches of fiduciary duties and other misconduct. Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu all served on the Board throughout the Relevant Period, and, as such, had fiduciary duties to ensure the Company's SEC filings, press releases, and other public statements and presentations made on behalf of the Company concerning its financial and business prospects were complete, accurate and true.

162.     Indeed, Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu were responsible for reviewing and approving the Company's SEC filings, financial statements, and other materials presented to the investing public.  By authorizing the false financial and public statements filed with the SEC during the Relevant Period as alleged herein, Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu were active participants in breaches of duties of good faith, candor, and loyalty, and, as a direct result, have subjected the Company to lawsuits claiming violations of the federal securities laws.  A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu to bring suit against themselves, or the executive management of the Company, would be a useless and futile act.

163.     Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu caused and/or allowed the Company to engage in deliberately issuing false and misleading statements to mislead investors, and as such, they each face a substantial likelihood of liability for causing TrueCar to engage in such illegal and unlawful conduct.  As described above, Defendants

Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu, knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period, causing the Company's stock to trade at artificially-inflated prices.

164.    As a result of the alleged misconduct described above, Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.  Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

165.    Additionally, Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu, as directors (and, in some cases, as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that TrueCar's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused TrueCar's stock to trade at artificially-inflated prices.  Thus, Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu, are directly responsible for TrueCar's failure to adopt and implement such internal controls, and for the substantial damages TrueCar is subject to in ongoing lawsuits.  As such, these Defendants face a substantial likelihood of liability for the claims asserted herein.  Demand is therefore futile as to them.

166. Further, Defendants Perry, Buce, Claus, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

167. Notably, Defendants Perry, Buce, Claus, Krafcik, Lantz, Nichols, and Yadigaroglu cannot impartially consider a demand to bring suit against themselves because each of them is a named defendant in the Securities Class Action, which alleges they made or disseminated many of the same misstatements described herein, in violation of the federal securities laws. Specifically, on February 5, 2019, the Honorable Stephen V. Wilson, United States District Court Judge of the Central District of California, issued an order in the Securities Class Action, denying defendants' motion to dismiss in its entirety and holding that the federal securities fraud claims could proceed against all of the defendants in that case, including Defendants Perry, Buce, Claus, Krafcik, Lantz, Nichols, and Yadigaroglu. Judge Wilson found that the allegations in the Securities Class Action were sufficient "under both the plausibility and heightened pleading standards" to demonstrate that the Individual Defendants "made materially false and misleading statements by making risk statements regarding TrueCar's reliance on USAA's website without alerting the public that the risk had already come to fruition and by falsely representing that USAA would be a key driver of unit and revenue growth in 2017." TrueCar and certain of its officers and directors therefore continue to be exposed to substantial liability for violations of the federal securities law. Thus, if any of those Defendants were to initiate suit on behalf of TrueCar, he or she would compromise his or her own ability to simultaneously defend himself or herself in the

Securities Class Action, and, at the same time, would face exposure to liability in this action.  None of these Defendants will do this.

168.   Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste, and abuse of control, constitute breaches of fiduciary duties for which they face a substantial likelihood of liability.  If Defendants Perry, Buce, Claus, Krafcik, Lantz, Nichols, or Yadigaroglu were to bring a suit on behalf of TrueCar to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For the foregoing reasons, demand is futile as to each of these Defendants.

## B.   Director Interestedness Based on Challenged Insider Sales

169.   During the Relevant Period, Defendants Buce, Krafcik, and Yadigaroglu illicitly sold shares of their personal TrueCar stock – or caused affiliated entities to sell the Company's stock – while in possession of material, adverse, non-public information, during a time in which TrueCar stock was artificially inflated due to the Individual Defendants' misconduct.  Moreover, in making or causing these sales, these Insider Selling Defendants violated the Company's Code of Conduct.

170.   As a result of their illegal insider trading activities, Defendants Buce, Krafcik, and Yadigaroglu received direct financial benefits not shared with TrueCar stockholders, and are, therefore, directly interested in a demand.  In fact, while in possession of material, non-public information, these Insider Selling Defendants collectively sold at least 4,158,693 million shares of

TrueCar stock at artificially inflated prices for proceeds of approximately $70.6 million. Furthermore, Defendants Buce, Krafcik, and Yadigaroglu are interested in a demand because they face a substantial likelihood of liability for breaches of fiduciary duties of loyalty and good faith based on the challenged insider sales.  Accordingly, a demand upon Defendants Buce, Krafcik, and Yadigaroglu would be futile.

### C.     Demand is Futile as to Audit Committee Defendants

171.    During the Relevant Period, Defendants Buce, Claus, and Lantz served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

### D.     Demand is Futile as to Defendant Perry for Additional Reasons

172.    In addition, demand is futile as to Defendant Perry, as TrueCar has admitted in its SEC filings that Perry does not meet the standards for director independence, given his current executive role as President and CEO of the Company.  According to the Company's 2018 Proxy,

Defendant Perry is not "independent" as that term is defined under the applicable rules and regulations of the SEC and the listing requirements and rules of the NASDAQ Stock Market.

173.    As detailed above, Defendant Perry also cannot impartially consider a demand to bring suit against himself because he is a named defendant in the Securities Class Action, which alleges that he made many of the same misstatements described above in violation of the federal securities laws.   Thus, if Defendant Perry was to initiate suit on behalf of TrueCar, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.   Defendant Perry will not do this, and demand is therefore futile.

174.    Defendant Perry is also not independent, nor disinterested, because he has financially benefitted from his own wrongdoing and the wrongdoing of the other Individual Defendants, and because his livelihood continues to depend on compensation from TrueCar.   For example, in 2017, at a time when he was making and causing TrueCar to make material misstatements concerning USAA's redesign of the co-branded car buying site, Defendant Perry received more $5 million in total compensation from TrueCar, including salary, bonus, stock awards, option awards, and other compensation.   As such, Perry cannot independently consider any demand to sue himself for breaching his fiduciary duties to TrueCar because that would expose him to liability and threaten his livelihood.

### E.    Demand is Futile as to Defendant Krafcik for Additional Reasons

175.    Demand is also futile as to Defendant Krafcik, because TrueCar has admitted in its SEC filings that Defendant Krafcik does not meet the standards for director independence.

176.    According to the Company's 2018 Proxy, based on the Board's review of information concerning his background, employment, and affiliations, the Board determined that Defendant Krafcik is not "independent" as that term is defined under the applicable rules and

regulations of the SEC and the listing requirements and rules of the NASDAQ Stock Market. Krafcik served as President of the Company from April 2014 until September 2015. Therefore, demand is futile as to Defendant Krafcik.

### F.  Demand is Futile as to Defendant Claus for Various Reasons

177.    Demand is also futile as to Defendant Claus due to his extensive business and professional ties to USAA. Despite currently serving as the Chairman of the Board of TrueCar, Defendant Claus, at the same time, serves on the Board of the USAA affiliate, USAA Real Estate Company, since at least 2009. Indeed, Claus has a longstanding and pervasive relationship with USAA from December 1994 to March 2014, as he has served in various senior executive roles at USAA, including as Executive Vice President of USAA Enterprise Advice Group and President of USAA Financial Services Group. Claus also previously served as the Senior Vice President and then President of USAA Investment Management Company and Vice President of Investment Sales and Services.

178.    Given his past and present professional ties with USAA, Defendant Claus was well aware of significant business and strategic decisions made by USAA, including its decision to significantly change the co-branded car buying site that it shared with TrueCar. Moreover, in his prominent position as Chairman of TrueCar and as a member of the Audit Committee, Claus would have shared information with other TrueCar Directors concerning the USAA redesign and its material impact on TrueCar's business operations during the Relevant Period, while at the same time, concealing such information from the investing public. Accordingly, Claus' dual role as TrueCar Chairman and USAA executive and board member created an inherent and direct conflict which renders Claus unable to objectively and disinterestedly consider bringing the claims set forth herein against himself and the other Individual Defendants.

179.     Additionally, in his position as USAA's representative on the Board, Defendant Claus, in conspiracy with USAA, concealed material adverse information regarding the impact of USAA's changes to the TrueCar co-branded website, yet allowed USAA, certain of the Individual Defendants, and other TrueCar insiders to engage in substantial stock sales at artificially-inflated prices, and reap substantial profits.   Defendant Claus therefore cannot impartially consider bringing the insider selling claims asserted herein, because to do so would expose USAA, the Individual Defendants, and himself to civil liability.   Demand is futile as to Defendant Claus for this additional reason.

### G.     Demand is Futile as to All Director Defendants for Additional Reasons

180.     The Board of TrueCar has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.   Despite the wrongdoing of the Company's executive officers, including Defendants Perry and Pierantoni, who, respectively, still serve as the Company's CEO and interim CFO, the Board has taken no action to address the harm this misconduct has caused the Company.

181.     In addition, each of the current directors receives annual cash compensation, as well as awards of TrueCar stock, purely for being a Board member.   This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood.   The total compensation to these Directors in the form of retainer fees, stock awards and other compensation for 2017 was as follows:

|      | Perry | Claus | Krafcik | Buce | Yadigaroglu | Lantz | Nichols | Mendel |
|------|-------|-------|---------|------|-------------|-------|---------|--------|
| 2017 | $5,086,264.00 | $239,969.00 | $204,969.00 | $224,969.00 | $149,969.00 | $214,969.00 | $217,118.00 | $338,784.00 |

182.     Demand on each of the directors is therefore futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of TrueCar's Board.

183.    Also, if TrueCar's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.   However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by TrueCar against the Director Defendants, known as the "insured versus insured exclusion."  As a result, if the members of TrueCar's Board were to sue themselves or certain officers of TrueCar, there would be no D&O Insurance protection, and, thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

184.    Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting TrueCar by prosecuting this action. Therefore, demand on TrueCar and its Board is futile and is excused.

185.    TrueCar has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the members of the Board are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

186.   Plaintiff has not made any demand on stockholders of TrueCar to institute this action since such demand would be a futile and useless act for the following reasons:

a.   TrueCar is a publicly-traded company with thousands of stockholders of record and at least hundreds of thousands of beneficial owners;

b.   making demand on such a number of stockholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of TrueCar stockholders; and

c.   making demand on all stockholders would force Plaintiff to incur excessive expenses and obstacles, assuming all stockholders could even be individually identified with any degree of certainty.

## COUNT I

**Derivatively for Contribution Under Sections 10(b) and 21D of the Exchange Act Against the Securities Class Action Defendants**

187.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against Defendants Perry, Guthrie, Pierantoni, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Nichols, and Yadigaroglu, each of whom is a named defendant in the Securities Class Action

189.   TrueCar is named as a defendant in the Securities Class Action, asserting claims under the federal securities laws for, *inter alia*, violations of Sections 10(b), 20(a) of the Exchange Act and Sections 11, 12(a)(2), and 15 of the Securities Act.  Judge Wilson has already denied defendants' motion to dismiss the complaint in the Securities Class Action in its entirety and found that plaintiffs in that case had satisfied the heightened pleading standards of Fed. R. Civ. Proc.

9(b), and the PSLRA.  If TrueCar is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of the Securities Class Action Defendants as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the Securities Class Action against the Company.

190.    As directors and officers of TrueCar, the Securities Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about TrueCar, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

191.    The Security Class Action Defendants are also liable under 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

192.    Accordingly, TrueCar is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants, who are responsible for exposing TrueCar to liability under the federal securities laws.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

193.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.    The Individual Defendants owed, and continue to owe, fiduciary obligations to TrueCar.  By reason of their fiduciary relationships, the Individual Defendants owed, and owe,

TrueCar the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.  As part of their fiduciary duties, the Individual Defendants were responsible for ensuring that TrueCar disseminated accurate, truthful, and complete information to its stockholders.

195.    Based on the misconduct alleged herein, the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, and loyalty.

196.    The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false information, through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein, which misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

197.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, TrueCar has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198.    Plaintiff, on behalf of TrueCar, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Violations of Section 29(b) of the Exchange Act**

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.    As a result of their conduct, as alleged in this Complaint, the Individual Defendants violated Section 10(b) of the Exchange Act during the time that they entered into contracts with TrueCar regarding their compensation.

201.    If TrueCar were to attempt to recover compensation from the Individual Defendants, these Defendants might assert a breach of contract claim and/or seek severance payments.

202.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

203.    The Individual Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with TrueCar.

204.    TrueCar was, and is, an innocent party with respect to the Exchange Act violations of the Individual Defendants.

205.    Plaintiff, on behalf of TrueCar, seeks rescission of the contracts between TrueCar and the Individual Defendants due to these Defendants' violations of the Exchange Act while performing their job duties.

206.    Even if the contracts are not rescinded by the Court as a result of the Exchange Act violations of the Individual Defendants, the Court can and should award equitable remedies in the form of injunctive relief barring these Defendants from asserting breach of contract by TrueCar in any action by Plaintiff on behalf of TrueCar to return compensation from these Defendants.

207.    Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## COUNT IV

**Against the Director Defendants for Breach of Fiduciary Duty for Failure to Take Action Against Illicit Insider Trading**

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    Director Defendants Perry, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu each owe TrueCar the fiduciary duties of good faith and loyalty.  Each had a duty to prevent illicit trades from happening and ensuring the Company's Code of Business Conduct was followed.  Further, upon learning of the Insider Selling Defendants' illicit trading, Defendants Perry, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu each had an affirmative duty to the Company to respond.

210.    Yet, the Director Defendants took no action to prevent or respond to these illicit trades.  Critically, Defendants Perry, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu knew, or should have known, that the Insider Selling Defendants were liquidating large amounts of the Company's stock while in possession of material, adverse, non-public information, in light of the publicly filed forms disclosing the size and scope of the trades.

211.    In other words, after failing to prevent the improper trades from taking place in the first place, Defendants Perry, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Mendel, Nichols, and Yadigaroglu have now known—for months—of the Insider Selling Defendants' misconduct, and have taken no action whatsoever, in violation of the Board's fundamental fiduciary duties of loyalty and good faith to TrueCar.

212.    As a direct and proximate result of the foregoing breaches of fiduciary duties by the Director Defendants, the Company has suffered significant damages, as alleged herein.

## COUNT V

**Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

213.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214.     At the time the Insider Selling Defendants sold their TrueCar stock, they knew the material, non-public information described above, and sold TrueCar stock on the basis of such information.

215.     The material, non-public information at issue was proprietary, non-public information regarding the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold TrueCar stock.  In conducting their illicit insider sales, the Insider Selling Defendants also knowingly disregarded provisions of the Company's Code of Business Conduct prohibiting such activities.

216.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

217.     Plaintiff, on behalf of TrueCar, has no adequate remedy at law.

### COUNT VI

**Against All Individual Defendants for Waste of Corporate Assets**

218.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

219.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

220.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and

directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

221.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

222.    Plaintiff, on behalf of TrueCar, has no adequate remedy at law.

## COUNT VII

### Against All Individual Defendants for Unjust Enrichment

223.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

224.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of TrueCar.

225.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to TrueCar.

226.    Plaintiff, as a stockholder and representative of TrueCar, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

227.    Plaintiff, on behalf of TrueCar, has no adequate remedy at law.

## COUNT VIII

### Against USAA for Conspiracy to Engage in Insider Selling and Misappropriation of Information

228.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

229.    As described in this Complaint, USAA sold securities at a time when they knew or recklessly disregarded material information about TrueCar, gained from their relationship with the Company, and sold shares of stock based on that information.

230.    USAA was aware of proprietary non-public information concerning the affinity group partnership with USAA, and the material changes that USAA would be effecting to the Company's website.   The information was a proprietary asset which jointly belonged to the Company and USAA.   USAA used this insider information for its own benefit when it sold TrueCar common stock.

231.    USAA took advantage of its knowledge as a *de facto* insider, with representation on the Company's Board, to sell shares at prices it knew to be inflated.

232.    USAA's sale of TrueCar common stock while in possession and control of this material adverse non-public information was the culmination of a conspiracy in which USAA joined in a breach of the insiders' fiduciary duties of loyalty and good faith.

233.    The Company is entitled to the imposition of a constructive trust on any profits USAA obtained through their improper sales of stock, due to USAA's use of joint proprietary information for USAA's own gain in conspiracy with Company insiders.

234.    Plaintiff, on behalf of TrueCar, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against Defendants, and in favor of the Company, for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, waste of corporate assets, violations of Section 29(b), and insider selling;

B.      Directing the Company to receive contribution and/or indemnification from the Securities Class Action Defendants for their wrongful acts and omissions, which exposed TrueCar to civil liability under the federal securities laws;

C.      Directing TrueCar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law, and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and asking such other action as may be necessary

D.      Awarding to TrueCar restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets to as to assure that Plaintiff on behalf of TrueCar has an effective remedy;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 3, 2019

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3800

*Attorney for Plaintiff*

**OF COUNSEL:**

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062